INTERCARGO INSURANCE
COMPANY, Plaintiff,

v.

BURLINGTON NORTHERN
SANTA FE RAILROAD,
et al., Defendants.

No. CV FMC 99–2372.

United States District Court,
C.D. California.

Sept. 28, 2001.

 

Stephen L. Bucklin, Michael S. McDaniel, Countyman & McDaniel, Los Angeles, CA, for plaintiff.

Leslie G. McMurray, Leslie G. McMurray Law Offices, Valley Village, CA, Bruce M. Cohen, Cohen & Lord, Marina Del Rey, CA, Thomas K. Rourke, Thomas K. Rourke Law Offices, Los Angeles, CA, Tonya L. Sullivan, Houston, TX, Michael M. Bergfeld, Paul J. Gutierrez, Cummins & White, Newport Beach, CA, Michael W. Lodwick, Haight Brown & Bonesteel, Santa Ana, CA, Stephen C. Bass, Berk Williams & Sorensen, San Francisco, CA, for defendants.

**ORDER DENYING DEFENDANTS' MOTIONS TO STRIKE PLAINTIFF'S EXPERT WITNESS DESIGNATION; ORDER DENYING DEFENDANTS' MOTIONS TO DESIGNATE REBUTTAL EXPERT WITNESSES; ORDER COMPELLING PLAINTIFF TO MAKE ADDITIONAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(A)(2)(B); ORDER GRANTING IN PART AND DENYING IN PART CROSS MOTIONS FOR SUMMARY JUDGMENT**

COOPER, District Judge.

This matter is before the Court on defendants' motions regarding plaintiff's expert witness designations, as well as the parties' cross motions for summary judgment. The Court deems these motions appropriate for decision without oral argument. See Fed.R.Civ.P. 78; Local Rule 7.11. Accordingly, the hearing set for October 1, 2001, is removed from the Court's calendar.

For the reasons stated below, defendants' motion to strike plaintiff's expert witness designation and defendants' alternative motion to designate rebuttal experts are **HEREBY DENIED**. For the reasons

and in the manner set forth below, the parties' motions for summary judgment are **HEREBY GRANTED IN PART AND DENIED IN PART.**

## I. Introduction

The present action arises out of the theft of a shipment of television sets and video cameras ("the shipment"). The shipment was carried via rail by defendant Burlington Northern Santa Fe Railroad ("BNSF")[1] to a rail yard ("Hobart Yard" or "the yard") owned by BNSF, and operated by defendant ITS. Defendant Esco Transportation is the trucking company that was to pick up the shipment from the yard. The theft was accomplished by a driver who was either an Esco employee, or a driver who impersonated an Esco employee. The owner of the shipment, Panasonic, filed a claim with its insurance company, plaintiff Intercargo Insurance Company ("Intercargo" or "plaintiff"), which paid Panasonic over $231,000. Panasonic assigned to Intercargo its rights to recover from defendants. Plaintiff has asserted state-law claims based on damage to cargo, negligence, breach of contract, and breach of bailment. BNSF and ITS have both asserted cross claims, and BNSF has asserted third-party claims. These cross claims and third-party claims are based on indemnity, apportionment of fault, breach of contract, and negligence.

At its essence, the issue before the Court is which, if any, defendant or defendants may be liable to plaintiff as a result of the stolen shipment. First, however, the Court will resolve the parties' disputed issue regarding the designation of expert witnesses.

## II. Expert Witnesses

Expert witness designations are governed by Fed.R.Civ.P. 26(a)(B)(2). Expert witness designations must be accompanied by written reports prepared and signed by the expert. *Id.* The report must contain 1) the expert's opinions and basis for those opinions, 2) the data and information considered by the expert in arriving at these opinions, 3) the exhibits used to support opinions, and 4) a description of the qualifications of the expert, a list of publications of the expert, the compensation to be paid to the expert, and a list of prior testimony.

Plaintiff designated two experts about 15 months ago. The two reports are not signed by the experts, and are identical in their substantive opinions. This similarity supports defendants contention that the reports were prepared by plaintiff's attorneys rather than the experts themselves. The exhibits supporting the experts' opinions were not attached to the reports, and one expert did not attach a list of qualifications, publications, testimony, or compensation to be paid. This expert did provide a curriculum vitae a few days after the report was disclosed.

It is evident to the Court that the reports are not in compliance with Rule 26(a)(2)(B) in many ways. As a result, defendants argue that the experts' reports should be stricken. Alternatively, Defendants would move to designate rebuttal expert witnesses.

Plaintiff argues that defendants simply missed the expert witness designation date—a date that was extended more than once. Having missed their deadline, defendants now seek to use the deficiencies in plaintiff's experts' reports an excuse to designate their own experts well after the time in which to do so has expired. The Court agrees.

---

**1.** Plaintiff has named a number of BNSF defendants, including the BNSF Railroad, the BNSF Railway, the BNSF Railroad Company, The BNSF Railway Company, and others. The Court refers to these entities collectively as BNSF.

■ Defendants' remedy for an inadequate expert report is to seek an order compelling adequate discovery. Exclusion of expert report or testimony is appropriate only when the failure to provide an adequate expert report is in violation of an order compelling discovery. *See* Rutter Group, Cal. Prac. Guide, Fed. Civ. P. Before Trial, §§ 11:209.5–.9, 11:918–919 (2001).

■ Defendants did not seek to compel a more adequate disclosure within a reasonable time of service of the expert reports. Accordingly, defendants may not now seek to exclude plaintiff's experts. Additionally, the Court is persuaded by plaintiffs' argument that defendants now attempt to exploit plaintiff's failure to comply with Fed.R.Civ.P. 26(a)(2)(B) in order to designate rebuttal experts that should have been designated long ago. Therefore, the Court **HEREBY DENIES** the motions to strike expert witness designation, and **HEREBY DENIES** the alternative motions to designate rebuttal experts as well. Plaintiff is **HEREBY ORDERED** to, within ten days of the entry of this order, take all action and make all supplemental disclosures necessary to ensure its experts' reports are in full compliance with Fed.R.Civ.P. 26(a)(2)(B).

### III. Summary Judgment Standard

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475

U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. 2505.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment." *Harper v. Wallingford,* 877 F.2d 728, 731 (9th Cir.1989).

The Court construes all evidence and reasonable inferences drawn therefrom in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Brookside Assocs. v. Rifkin,* 49 F.3d 490, 492–93 (9th Cir.1995).

### IV. Uncontroverted Facts

Third-party defendant Hub Group ("Hub") arranged for shipment of the goods from its origin to its destination in Cypress, California. The shipment's journey involved a number of different carriers. Hub hired a trucking company to take the shipment to a rail yard in Chicago, where it was then transported by rail (by defendant BNSF) to the Hobart Yard. From there, the shipment was to be picked up by defendant Esco and trucked to Cypress, California.[2]

---

**2.** Plaintiff's objections to the testimony of Cheryl Debow, manager of drayage for Hub, regarding Hub's role in facilitating the shipment are overruled. Debow need not be an

expert to so testify, and plaintiff has provided no reason for the Court to conclude that the

BNSF contracted to carry the shipment and incorporated its own intermodal rules and policies. The rules and policies enable the shipper to select from a variety of types of shipment arrangements. These arrangements had varying degrees of protection against risk of loss or damage of cargo; not surprisingly, cost of shipment varied according to the protection against risk or loss or damage. Hub had notice of the option to ship with full Carmack Amendment liability protection, as evidenced by a blanket contract entered into by Hub and BNSF, but did not elect to ship with this level of protection; instead, the shipment at issue was shipped under code "25," which is a "ramp to ramp" shipment.[3] The shipment left Chicago in a sealed container in good condition, and it was placed on the ramp in Hobart Yard in unchanged condition.

BNSF owns Hobart Yard, but contracts with defendant In–Terminal Services ("ITS") to operate the yard. The yard is approximately 200 acres in size, and approximately 700,000 shipments are loaded and unloaded there each year. ITS's duties in operating the yard include providing checkpoint services—services designed to ensure that only those authorized to do so leave the yard, through its many gates, with shipments that are received in the yard.

ITS is required by its contract with BNSF to conduct background checks on its employees, to not hire any individuals that have been convicted of theft offenses, and to indemnify BNSF in the event that theft results from an ITS failure to adhere to proper checkpoint procedures.

In March 1997, when the shipment was stolen, James Hensley was an outgate inspector with ITS. Mr. Hensley has a long record of incarceration; he estimates he has several hundred criminal convictions.[4] Although Hensley indicated on his employment application that he had been convicted of a felony, no one ever asked him to elaborate. In connection with the present action, Hensley later testified that he'd been arrested numerous times, but convicted of felonies only three times—all drug related. Hensley has also had petty theft convictions.

Hensley received little training; he characterizes the training he received as "on the job training."

The excerpts of Hensley's deposition that have been filed with the Court evidence that Hensley has little recollection of the shipment leaving the yard. Hensley has testified as to his understanding of the checkpoint procedures, and that generally, he believes he followed these procedures before allowing the shipment to leave the yard. There is a videotape of the shipment leaving the yard, but it has not be filed or lodged with the Court.

The driver who took the shipment represented that he was from Esco. Hensley was aware that he was to check the driver's license of the driver hauling the shipment. Hensley was to check the validity of the license,[5] match the photo on the license to the driver in the truck, and match the driver's license number to the

testimony was not based on personal knowledge.

3. Cheryl DeBow, manager of drayage at the Hub Group, confirms that BNSF's leg of the journey ended at the ramp in the yard in LA. At that time, BNSF notified ESCO the shipment was ready for pick up. For the reasons noted in the previous footnote, plaintiff's ob-

jections to DeBow's testimony regarding this issue are overruled.

4. Hensley estimates that his "rap sheet" is three inches thick.

5. Hensley also testified, however, that at some unspecified point in time, ITS was unconcerned if the drivers' license was expired.

number on the form he received regarding outgoing shipments.[6] Hensley was also to check to insure that a specific placard that is required to gain access to the yard was permanently affixed to the truck. In March 1997, ITS did not make a photocopy of the drivers' licenses that its employees inspected. Hensley acknowledged from viewing the videotape of the theft that the driver was attempting to hide his face.[7] Hensley also acknowledged that the truck that picked up the shipment was smaller than most, and that that was unusual.

Nevertheless, Hensley allowed the truck to leave the yard without further inquiry. Hensley knew what to do if he had any concerns about the truck leaving the yard—detain the truck and call BNSF security. Hensley did not do this.

Hensley also testified that the contents of the sealed container could not be known without "inside information." Hensley stated that he had no knowledge of what was in the container. Hensley testified that other thefts had occurred in the yard as well.

The CEO of Esco, Selph, testified as well. Selph testified that in order to get a trailer out of the yard, a driver need only have a trailer number and a truck. He also testified that March 1997 was not the first time someone impersonating an ESCO driver drove off with some Panasonic electronics or other goods. He testified that it had happened maybe twice in 1996 and once in 1997 at the nearby City of Industry ramp. At least one of these other incidents involved Panasonic electronics.

Plaintiff has offered the declaration of Hub's Executive Vice President, Jim Weaver. Weaver testified that the checkpoint procedures should have consisted of checking the license plate number on the truck-tractor to ensure it is current and valid, making sure an identifying placard is permanently attached, checking driver's license number against approved list of drivers, and using a "pick up number system" (a kind of password protection—driver must know the "pick up number").[8]

■■ Plaintiff has also offered the declaration of its expert, Jim Harris.[9] Harris

---

6. Hensley testified that there was not ever a list of approved drivers for each trucking company.

7. Jerry Albright, a BNSF police agent, reviewed the videotape and confirms that the driver was acting suspiciously and was trying to hide face. Albright states that Hensley should have called BNSF police, and that the police would have responded immediately.

8. Defendants have objected to Weaver's declaration because he has not appeared on plaintiff's witness list. Defendants have cited no authority, and the Court is not aware of any requirement that a party, in connection with a motion for summary judgment, must confine the testimonial evidence presented to that obtained from witnesses disclosed on that party's witness list. Defendants' objection is overruled.

9. Plaintiff objects to the testimony of Harris. Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Thus, expert testimony is admissible if the purported expert is qualified as an expert and his knowledge will assist the trier of fact understand the evidence or determine a fact in issue. The Court finds that Harris's expert testimony is helpful to understand industry standards regarding checkpoint procedures. Moreover, the Court finds that Harris is qualified as an expert. Harris's resume indicates that he holds a B.A. in Criminal Justice and an M.S. in Public Administration. He is a thirty year police veteran and has multiple years of experience involving cargo security matters, both as a police officer and as a private consultant to the transportation industry. This education and experience qualifies Harris as an expert pursuant to Fed.R.Civ.P. 702. *See Thomas v. Newton Int'l Enters.,* 42

is of the opinion that BNSF, ITS, and Esco, breached a duty of care owed to Panasonic to use a pick up number system and to maintain a list of approved drivers. ITS also breached a duty of care by hiring a convicted felon and by failing to detain a driver who exhibited suspicious behavior.

## V. Subject Matter Jurisdiction

Defendants argue that the Court has no subject matter jurisdiction. Plaintiff's sole remedy, they argue, is under the Carmack Amendment, and the Complaint does not allege a claim under the Carmack Amendment. The Court must determine first whether it has subject matter jurisdiction over the current action before considering the parties' motions. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

Plaintiff's claims are based on the loss of goods while in ground transit; therefore, to the extent that plaintiff's claims are asserted against "carriers" as defined by the Carmack Amendment, those claims are preempted. *See Missouri Pacific R.R Co. v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964); *Insurance Co. of N. Am. v. Federal Express Corp.*, 189 F.3d 914 (9th Cir.1999) (noting that the Carmack Amendment preempts state regulation of common carriers); *Ward v. Allied Van Lines, Inc.*, 231 F.3d 135 (4th Cir.2000) (noting that the Carmack Amendment preempts a shipper's state and common law claims against a carrier for loss or damage to goods during shipment).

As explained below, BNSF is a "carrier" under the Carmack Amendment. So too is Esco. Accordingly, if the complaint asserts a Carmack Amendment claim, the Court has subject matter jurisdiction.

F.3d 1266, 1269 (9th Cir.1994) ("Fed.R.Evid. 702 ... contemplate broad conception of expert qualifications.")

The complaint sets forth causes of action for loss of cargo, negligence, breach of contract, and breach of bailment. The complaint does not mention the Carmack Amendment. Nevertheless, the Court construes plaintiff's claims as asserting a claim under the Carmack Amendment. The complaint is clear as to the basis of plaintiff's claim, and this is all that is required of plaintiff at the pleading stage. *See Consolidated Rail Corp. v. Primary Indus. Corp.*, 868 F.Supp. 566 (S.D.N.Y. 1994) (construing a claim for breach of contract as an action under the Carmack Amendment); Fed.R.Civ.P. 8(a)(2) (requiring that a complaint contain only a short and plain statement of the claim showing that the pleader is entitled to relief); Fed. R.Civ.P. 8(f) (requiring the Court to construe the pleadings so as to do substantial justice).

■ Accordingly, the Court concludes that plaintiff has asserted a claim arising under federal law, the Carmack Amendment, and therefore the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. The Court has and will exercise supplemental jurisdiction over the state law claims asserted against the non-carriers. *See* 28 U.S.C. § 1367(a) (conferring supplemental jurisdiction over state law claims that are so related to the federal claims that they form part of the same case or controversy).

## VI. Defendant BNSF

Defendant BNSF is a "rail carrier" under the Carmack Amendment. *See* 49 U.S.C. § 10102(5) (defining "rail carrier" as a person providing common carrier railroad transportation for compensation). Accordingly, liability against BNSF, if it is to be found, must be found under the Carmack Amendment.

Accordingly, the objection to Harris's declaration is overruled.

■ The Carmack Amendment operates to shift the burden of proof in cases in which a shipper claims damages as a result of loss of or damage to cargo by common carriers, including rail carriers. This is in keeping with the Carmack Amendment's purpose of relieving "shippers of the burden of searching out a particular negligent carrier from among the numerous carriers handling an interstate shipment of goods." *Reider v. Thompson,* 339 U.S. 113, 119, 70 S.Ct. 499, 94 L.Ed. 698 (1950). A shipper establishes a prima facie case of liability under the Carmack Amendment when it shows that goods, which were dropped off in good condition, arrived in damaged condition (or not at all), and the amount of damages. *Missouri Pac. R.R. Co. v. Elmore and Stahl,* 377 U.S. 134, 138, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964) (setting forth elements of prima facie case).

BNSF argues that it effectively contracted out of the Carmack Amendment. Pursuant to 49 U.S.C. § 10502(e), the Carmack Amendment permits rail carriers to offer alternative terms of coverage of risk of loss. The use of alternative terms does not negate the application of the Carmack Amendment; rather, the use of alternative terms is seen as a type of affirmative defense that a rail carrier may assert against a claim for damages under the Carmack Amendment. *See M.R. Swanson, Inc. v. Burlington N. and Santa Fe Ry. Co.,* 2001 WL 201378 (E.D.Cal. Feb.21, 2001).

■ Before BNSF may assert this affirmative defense, however, it must establish that it (1) maintains a tariff (i.e., has filed a rate schedule) in compliance with the requirements of the Surface Transportation Board ("STB") (successor to the Interstate Commerce Commission ("ICC")), (2) gave the shipper a reasonable opportunity to choose between two or more levels of liability, (3) obtained the shipper's agreement as to its choice of carrier liability limit, and (4) issued a bill of lading prior to moving the shipment. *See Hughes Aircraft v. North Am. Van Lines,* 970 F.2d 609, 611–13 (9th Cir.1992).

BNSF argues that this test is not applicable to it because the statutory section upon which it was based, 49 U.S.C. § 10730, was repealed in 1995. In 1995, many, if not all, of the provisions of Title 49 of the United States Code, were repealed, re-organized, and reenacted. *See* ICC Termination Act of 1995, P.L. 104–88, 109 Stat. 803 abolishing the Interstate Commerce Commission, creating the Surface Transportation Board, and reorganizing Title 49; Table III, Subtitle IV, Title 49, United States Code ("Table III") (preceding 49 U.S.C. § 10102) (table comparing former Title 49 provisions with new Title 49 provisions). BNSF argues that § 10703 is now § 14706, which is applicable only to motor carriers, not rail carriers. Table III reveals, however, that § 10730 is now found at § 11706(c)(3), which is applicable to rail carriers.[10] Accordingly,

---

10. The applicable provision of § 10730, as it appeared in the 1994 United States Code, read:

(a) The Interstate Commerce Commission may require or authorize a carrier ... to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation....

(b)(1) ... a motor common carrier providing transportation or service ... may ... establish rates for the transportation of property ... under which the liability of the carrier or freight forwarder for such property is limited to a value established by written declaration of the shipper or by written agreement between the carrier or freight forwarder and shipper if that value would be reasonable under the circumstances surrounding the transportation. (2) Before a carrier or freight forwarder may

BNSF's argument that the four-part test of *Hughes Aircraft* is not applicable to it is not persuasive.

BNSF also argues that the uncontroverted evidence establishes that it has met the requirements of this test. BNSF correctly points out that the uncontroverted facts establish that the shipment traveled under a waybill reflecting the shipment rates, and that Hub selected the lower freight rate (and accompanying lower rates) after being given the opportunity to pay a higher rate for full Carmack Amendment liability protection. These uncontroverted facts establish that BNSF has met the second, third, and fourth parts of the *Hughes Aircraft* test. BNSF makes no argument, however, that it has met the first part of this test.[11]

Accordingly, the Court concludes that BNSF is not entitled to summary judgment on the basis of its contractual limitation of liability affirmative defense.

■ Nevertheless, BNSF is entitled to summary judgment as to plaintiff's claim under the Carmack Amendment. The uncontroverted facts establish that BNSF contracted to transport the shipment "ramp to ramp." BNSF's liability ended when it safely delivered the shipment to the ramp in the Hobart Yard and notified Esco that the shipment was available to be picked up. *See Tokio Marine and Fire Ins. Co., Ltd. v. Chicago & Northwestern Transp. Co.*, 129 F.3d 960 (7th Cir.1997) (holding that rail carrier had no liability under the Carmack Amendment for a ramp to ramp shipment where rail carrier delivered shipment to destination ramp and notified consignee that the containers were available for pick up). Accordingly, the Court **HEREBY GRANTS** summary judgment in favor of BNSF as to plaintiff's Carmack Amendment claim.

Because of the preemptive scope of the Carmack Amendment, the only claim plaintiff may assert against BNSF is a claim for damages under the Carmack Amendment; accordingly, the Court also **HEREBY GRANTS** summary judgment in favor of BNSF as to plaintiff's remaining state law claims.

### VII. Third–Party Defendant Hub

BNSF has asserted third-party claims for equitable indemnification and apportionment of fault against third-party defendant Hub. No other party has asserted claims against Hub. Because the Court has granted summary judgment in favor of BNSF, it appears that these claims are moot. BNSF's claims against Hub are therefore subject to the Court's show

---

establish a rate for any service under paragraph (1) of this subsection, the Commission may require such carrier or freight forwarder to have in effect and keep in effect, during any period such rate is in effect under such paragraph, a rate for such service which does not limit the liability of the carrier or freight forwarder.

Current § 11706(c)(3), which is applicable to rail carriers, is similar in substance:

A rail carrier providing transportation or service ... may establish rates for transportation of property under which—(A) the liability of the rail carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier; or (B) specified amounts are deduct-

ed, pursuant to a written agreement between the shipper and the carrier, from any claim against the carrier with respect to the transportation of such property.

**11.** BNSF has not argued, and therefore the Court has not considered, whether, with the abolition of the ICC and creation of the STB, Congress abolished the requirement that rail carriers file a tariff rate be filed with the STB. *Cf. Consolidated Rail Corp. v. Canada Malting Co., Ltd.*, No. CIV A 98–5984, 2000 WL 151160 (E.D.Pa., Feb. 10, 2000) (citing 49 U.S.C. § 11101(b) and concluding that a rail carrier is not required to file its tariff rate with the STB); 49 U.S.C. § 11101(b) ("A rail carrier shall also provide to any person ... the carrier's rates and other service terms.").

cause order as set forth in section IX, *infra.*

## VIII. Defendant ITS

The parties appear to agree, as does the Court, that ITS is not a carrier, and is therefore not subject to Carmack Amendment. *See* 49 U.S.C. § 10102(5) (definition of a "rail carrier"); 49 U.S.C. § 13102 (definition of a "motor carrier"). Therefore, plaintiff's claims against ITS are not preempted by the Carmack Amendment.

 ITS argues that plaintiff's claims are barred by the doctrine of superior equities. Under the doctrine of the superior equities, where the fault of the third person is the "primary cause" of the loss, a superior equity in the surety is created. *See Golden Eagle Ins. Co. v. First Nationwide Financial Corp.*, 26 Cal. App.4th 160, 171, 31 Cal.Rptr.2d 815 (1994). For the reasons set forth below in connection with the Court's analysis of plaintiff's negligence claim against ITS, plaintiff has raised a triable issue of fact as to whether ITS was the "primary cause" of loss.

Because the claims against ITS are not preempted by the Carmack Amendment or barred by the doctrine of superior equities, each of plaintiff's four claims must be considered by the Court.

### A. Negligence

 In order to assert a claim based on negligence, a plaintiff must generally establish that a duty of care was owed, that the duty was breached, that there was the requisite proximate cause, and resulting damages. *Paz v. State of California,* 22 Cal.4th 550, 559, 93 Cal.Rptr.2d 703, 994 P.2d 975 (2000) (*en banc* ).

Plaintiff's claim is one asserted under the negligent undertaking theory of liability articulated in section 324A of the Restatement (Second) of Torts. *See Paz,* 22 Cal.4th at 558–59, 93 Cal.Rptr.2d 703, 994 P.2d 975 (holding that the negligent under-taking theory of liability was implicated where plaintiff alleged that defendant breached its contractual obligation to a third party). Section 324A reads:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform] his undertaking, if [ ](a) his failure to exercise reasonable care increases the risk of such harm, or [ ](b) he has undertaken to perform a duty owed by the other to the third person, or [ ](c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A.

Applying § 324A, the California Supreme Court has articulated the requirements for liability under the negligent undertaking theory of liability:

> [A] negligent undertaking claim of liability to third parties requires evidence that: (1) the actor undertook, gratuitously or for consideration, to render services to another; (2) the services rendered were of a kind the actor should have recognized as necessary for the protection of third persons; (3) the actor failed to exercise reasonable care in the performance of the undertaking; (4) the actor's failure to exercise reasonable care resulted in physical harm to the third persons; and (5) either (a) the actor's carelessness increased the risk of such harm, or (b) the actor undertook to perform a duty that the other owed to the third persons, or (c) the harm was suffered because either the other or the third persons relied on the actor's undertaking.

*Paz,* 22 Cal.4th at 559, 93 Cal.Rptr.2d 703, 994 P.2d 975. This theory of liability subsumes the elements of a general negligence claim—duty, breach of duty, proximate cause, and damages. *Id.*

The first factor is unquestionably met. It is undisputed that ITS undertook, for consideration, the operation of the Hobart Yard.

▆▆▆▆ The second factor—whether the services were of a kind that ITS should have recognized as necessary for the protection of third persons—is akin to the inquiry of whether ITS owed Panasonic a duty of care. The existence of a duty of care is a question of law for the Court. *Paz,* 93 Cal.Rptr.2d at 708, 994 P.2d 975. Based on the uncontroverted facts, the Court has no trouble concluding that ITS should have recognized that fulfillment of its contractual obligations to BNSF was necessary to protect Panasonic's shipment from theft. This duty of care necessarily includes an adequate system of checkpoint procedures. The purpose of the checkpoint procedures is to ensure that no unauthorized person removes a shipment from the Hobart Yard. Adherence to these procedures is necessary to protect Panasonic and other shippers. Therefore, the second factor is also met.

▆▆▆▆ The third factor—whether ITS failed to exercise reasonable care in its checkpoint procedures—is the subject of expert testimony regarding the industry standard of care for checkpoint procedures. Experts may testify regarding industry standards where the average lay person has little or no knowledge regarding those industry standards. *Miller v. Los Angeles County Flood Control Dist.,* 8 Cal.3d 689, 106 Cal.Rptr. 1, 505 P.2d 193 (1973); *see also* Fed.R.Evid. 702 (expert testimony is admissible if it will assist the trier of fact to understand the evidence or to determine a fact in issue). Plaintiff's expert has offered the opinion that ITS

breached a duty of care owed to Panasonic by failing to maintain a list of approved drivers, by failing to implement a pick up number system, by failing to detain a driver who exhibited suspicious behavior, and by hiring a convicted felon to guard the gates.

▆▆▆▆ ITS argues that Hensley's testimony controverts that of plaintiff's experts. However, it is undisputed that ITS did not maintain a list of approved drivers, and did not have a pick up number system in place. Moreover, it is undisputed that ITS hired Hensley in violation of its contract with ITS due to Hensley's numerous convictions. Finally, it is undisputed that the driver exhibited suspicious behavior by trying to hide his face. These uncontroverted facts establish that ITS breached its duty of care to Panasonic.

ITS also argues that it did not breach its duty of care because it did not breach its contract with BNSF. The contract between BNSF and ITS requires ITS to provide checkpoint services at the yard. (*See* Exhibit A to ITS's motion for summary judgment at § 1(c)). ITS's checkpoint duties included but were not limited to certain duties enumerated in this section. This section also provides that checkpoint services "include[,] but [are] not limited to" that enumerated list. Reasonably read, § 1(c) requires that ITS provide checkpoint services that meet the industry standard of care. The uncontroverted expert testimony establishes that this standard was not met. Therefore, the Court concludes that the third factor is also met.

▆▆▆▆ Conversely, ITS has established a triable issue of fact with respect to the fourth factor—whether its failure to provide adequate checkpoint services resulted in harm to Panasonic. The uncontroverted evidence supports two possible inferences. Either an imposter posing as an Esco driver stole the shipment from the

yard, or a legitimate Esco driver stole the shipment from the yard. If an imposter stole the shipment, then ITS's failure to adhere to adequate checkpoint services could be seen as causing the harm to Panasonic. If, however, an Esco driver stole the shipment, ITS's failure to adhere to adequate checkpoint services may well not have caused the harm to Panasonic, as a legitimate Esco driver could well have eluded all checkpoint security measures. Accordingly, ITS has raised a triable issue of fact with respect to the fourth issue: causation.

The fifth factor is met because ITS's failure to adhere to adequate checkpoint security procedures increased the risk of the harm of theft of shipments.

In sum, ITS has raised a triable issue of fact as to plaintiff's claim of negligence. Specifically, ITS has raised a triable issue of fact as to whether its negligence caused Panasonic's loss.

**B. Breach of Bailment**

Plaintiff asserts a breach of bailment claim as well. In California, the traditional bailee/bailor language has been replaced by language that would denominate ITS the "depositary" and Panasonic the "depositor." *See* Cal. Civ.Code § 1814 *et seq.* A bailment is referred to as a "deposit." *Id.* The uncontroverted facts establish that Panasonic and ITS established a "deposit for keeping," wherein ITS was required to return to Panasonic the identical thing deposited. *See* Cal. Civ.Code § 1817. A depositary can be liable to a depositor when its negligence causes loss or injury to the deposit. *See* Cal. Civ.Code §§ 1838, 1840.

■■■ This statutory scheme makes plaintiff's breach of bailment claim duplicative of its negligence claim. Accordingly, ITS has raised a triable issue of fact with respect to plaintiff's breach of bailment claim for the same reason that it has raised a triable issue of fact with respect to its negligence claim—the uncontroverted facts do not establish causation.

**C. Breach of Contract**

Plaintiff also asserts a breach of contract claim against ITS. There is no evidence before the Court, however, that suggests that Panasonic and ITS entered into any contract. Panasonic very well could be a third-party beneficiary of contracts between the other parties to this action, but plaintiff does not assert this claim as a third-party beneficiary and it is too late for plaintiff to do so now. *See Luis v. Orcutt Town Water Co.,* 204 Cal.App.2d 433, 441, 22 Cal.Rptr. 389 (1962) (holding that to recover as a third-party beneficiary, a plaintiff must plead that a contract was expressly made for its benefit) (citing Cal. Civ.Code § 1559); *cf. Rodrigues v. Campbell Indus.,* 87 Cal.App.3d 494, 501, 151 Cal.Rptr. 90 (1978)(granting plaintiffs leave to amend to allege that they were third-party beneficiaries of a contract). Therefore, the Court **HEREBY GRANTS** summary judgment in favor of ITS as to plaintiff's breach of contract claim.

**D. Damage to Cargo**

Plaintiff's claim for damage to cargo alleges that defendants failed to deliver cargo in the same good order and condition as when received per the terms of their tariff or bill of lading. This claim is not applicable to ITS, and the Court **HEREBY GRANTS** summary judgment in favor of ITS as to plaintiff's damage to cargo claim.

**IX. BNSF's Cross Claims and Third–Party Claims**

BNSF has asserted a number of cross claims and counterclaims based on indemnity, breach of contract, and apportionment of fault. This order grants summary judgment in favor of BNSF as to all claims asserted against it. BNSF is **ORDERED**

to show cause, within twenty days of the entry of this Order, why its counterclaims and third-party claims should not be dismissed as moot.

### X. ITS's Cross Claims

ITS has asserted cross claims against BNSF seeking indemnification and based on negligence and breach of contract. However, ITS has not substantiated these cross claims. As noted above, BNSF's duties were discharged once it delivered the shipment to the ramp in the yard. Accordingly, the Court **HEREBY GRANTS** summary judgment in favor of BNSF as to all ITS's cross claims.

### XI. Conclusion

Defendants' motions to strike plaintiff's expert witness designations (docket # 146–1, 147–1) are **HEREBY DENIED.**

Defendants' alternative motions to designate rebuttal expert witnesses (docket # 146–2, 147–2) are **HEREBY DENIED.**

Plaintiffs are **HEREBY ORDERED** to, within ten days of the entry of this Order, take all action and make all supplemental disclosures necessary to ensure its experts' reports are in full compliance with Fed. R.Civ.P. 26(a)(2)(B).

Defendant BNSF's motion for summary judgment (docket # 78) is **HEREBY GRANTED**; judgment in favor of BNSF is to be entered in favor of BNSF as to all claims asserted against it. BNSF is **HEREBY ORDERED** to, within ten days of the entry of this Order, lodge a proposed judgment in conformity with this Order. BNSF is also **ORDERED TO SHOW CAUSE**, within twenty days of the entry of this Order, why all its cross claims and counterclaims should not be dismissed as moot.

Third–Party Defendant Hub's motion for summary judgment (docket # 84) is **HELD IN ABEYANCE** pending resolution of the Court's show cause order.

Defendant ITS's motion for summary judgment (docket # 91) is **HEREBY GRANTED** as to plaintiff's claims for breach of contract and damage to cargo (the first and third causes of action), but is **HEREBY DENIED** as to plaintiff's claims for negligence and breach of bailment (the second and fourth causes of action).

Plaintiff's motion for summary judgment (docket # 83) is **HEREBY DENIED.**