In re LEAP WIRELESS INTERNA-
TIONAL, INC., and Cricket Com-
munications, Inc., et al., Debtors.

No. 03–03470–A11 to 03–03535–A11.

United States Bankruptcy Court,
S.D. California.

Oct. 16, 2003.

Robert A. Klyman, Latham & Watkins, Los Angeles, CA, for Debtors.

Carol C. Lam, United Attorney, San Diego, CA, Tiffany L. Carroll, Office of U.S. Trustee, San Diego, CA, for U.S. Trustee.

MEMORANDUM OPINION RE: MOTION TO STRIKE THE REPORT AND TESTIMONY OF BRUCE FALKENBERG

LOUISE DECARL ADLER, Bankruptcy Judge.

## I.

## INTRODUCTION

MCG PCS, Inc. ("MCG PCS"), shareholder and disputed creditor of Leap Wireless International, Inc. ("Leap"), has objected to and moved to strike the expert report and testimony of Bruce Falkenberg, a witness tendered by Leap and its subsidiaries ("Debtors") to value the wireless license portfolio owned by the Debtors. Because the motion was brought for the first time during the evidentiary hearing on confirmation of the Debtors' plan of reorganization, the Court delayed ruling upon the motion and requested the filing of simultaneous briefs. For the reasons more fully set forth below, the Court grants the motion.

## II.

## FACTUAL BACKGROUND

The Debtors filed Chapter 11 reorganization petitions on April 13, 2003. The Debtors own ninety nine wireless telecommunications licenses in markets throughout the country. They operate their business through Leap's wholly-owned subsidiary, Cricket Communications, Inc. ("Cricket").

The Debtors seek to confirm their Fifth Amended Joint Plan of Reorganization, dated as of July 30, 2003 ("Plan"). The Plan provides for the Debtors' continued operation of their business under the umbrella of Reorganized Leap, a private company. The Plan effects a global compromise between, *inter alia,* the Debtors, Leap's Noteholders and Cricket's Vendor Debt Holders. Pursuant to the compromise, the claims of Leap's general unsecured creditors will be channeled to a trust which will pay them approximately 13–14% of their claims, including receipt of 3.5% of the newly issued common stock of Reorganized Leap. The interests of existing Leap's shareholders will be cancelled, with the remaining 96.5% of the new common

stock issued to Cricket's Vendor Debtor Holders. The general unsecured creditors and shareholders of the debtor-subsidiaries receive nothing under the Plan.

At issue in confirmation of the Plan is not only the value of the licenses but also the enterprise (going concern) value of Reorganized Leap. MCG PCS has objected to confirmation, claiming the license value and the going concern value of the company is far greater than the Debtors claim. Since the Plan is predicated on the assumption that shareholders are "out of the money" and therefore, they should have their shares cancelled, value of the licenses is an important issue in this case.

Bruce Falkenberg is president of Falkenberg Capital Corp., an NASD registered broker/dealer specializing in telecommunications investment banking services. In that capacity, the company generally and Mr. Falkenberg personally have represented sellers of wireless spectrum. It is this representation of prior sellers which gives rise to the problem presented in the evidentiary objection.

In arriving at his determination that the Debtors' ninety nine licenses should be discounted an average of 70% to Auction 35 pricing,[1] Falkenberg relied on comparable sales information and "term sheets" subject to confidentiality agreements with respect to eighteen of those licenses. Apparently, these were license transactions in which Falkenberg Capital represented one of the parties:

Q. Were there any other markets where you used information that was subject to a confidentiality agreement?

A. If we went back to the schedule ... that's in the back, every one where we did not disclose a price, we had information that was subject to a confidentiality agreement. That information informed our opinion.

[R.T. 108:15–21]

Falkenberg's expert witness report has virtually no information concerning the methodology he used to arrive at the license values. At trial, Falkenberg described his methodology as follows: first, a senior analyst went to the FCC website to accumulate data concerning the licenses and to compile a complete list of the Debtors' licenses. Next, the analyst compared the independently prepared list with the Debtors' data to create an accurate list of the Debtors' licenses. At that point, the analyst priced the licenses under the assumption they were in Auction 35, as a bench mark to measure against, and forwarded the analysis to the managing director. [R.T. 35:3–17]

Thereafter, the managing director evaluated each of the licenses on a market-by-market basis using the four criteria that Falkenberg believes impact value. These criteria are: (1) the overall market conditions in a particular market; (2) the strategic plans of potential buyers to purchase spectrum in a particular market; (3) the population size of the market; and (4) the amount of other spectrum for sale in a particular market. Based upon this criteria, the marketing director made initial judgments as to the appropriate discount to Auction 35 prices for each license, and wrote a narrative for each market. [Falkenberg Capital Corp. Report at Exh. 1; R.T. 35:18–25; 36:1–17]

This package was forwarded to Falkenberg, who reviewed each individual market, and for some of the markets, adjusted the discounts based upon his personal

---

1. Auction 35 was an FCC license auction concluding in January 2001 which is generally agreed to be the top or highest price at which FCC licenses have sold. Their values since have declined precipitously from that peak.

knowledge of actual price information that he was aware of. [R.T. 35:3–25, 36:1–24; 57:13–20] He was unable to disclose some of this actual price information due to confidentiality agreements. [*See* Falkenberg Capital Corp. Report at Exh. 2; R.T. 58:1–25, 59:1–21; 62:22–25, 63:1–18]

In sum, each of the licenses was discounted by a different percentage to Auction 35 prices based upon the managing director's initial judgments applying the four criteria that impact value, and Falkenberg's additional adjustments based upon his personal knowledge of actual price information. The combined analysis yielded an average discount of approximately 70% to Auction 35 prices. Falkenberg guessed that the majority of the managing director's initial discounts were modified to some extent by him. [R.T. 56:18–25]

## III.

## ANALYSIS

■ As a preliminary matter, MCG PCS makes its motion to strike in part based on Federal Rule Civil Procedure 26(a)(2)(B).[2] That rule requires that the disclosure of expert testimony shall be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions and the basis and reasons therefor; the data or other information considered by the witness in forming those opinions; any exhibits to be used as a summary of or support for those opinions; the qualifications of the witness, including a list of the publications authored by the expert; and the compensation to be paid by the expert. MCG PCS correctly points out that Falkenberg's report had none of these.

However, the Debtors counter that the objection to the report based on its failure to comply with Rule 26 is untimely as it was first made during trial. The Court agreed in part with the Debtors' position, having overruled some of the objections to the report based on Falkenberg's failure to sign the report and the failure of the report to comply in many other respects with Rule 26.

■ Although there is scant case law concerning Rule 26 objections, generally, the remedy for a deficient expert report is a motion to compel in advance of trial. *See Intercargo Insurance Co. v. Burlington Northern Santa Fe Railroad*, 185 F.Supp.2d 1103, 1107 (C.D.Cal.2001) ("Defendants did not seek to compel a more adequate disclosure within a reasonable time of service of the expert reports. Accordingly, defendants may not now seek to exclude plaintiff's experts."); *see also* Schwarzer, Tashima & Wagstaffe, Cal. Prac. Guide: Fed. Civ. Pro. Before Trial (The Rutter Group 2003), ¶¶ 11:415–418 at 11–37–11–38 (suggesting judges are not likely to exclude an expert's testimony because of an insufficient expert report unless the attorney promptly moved for more adequate disclosures.)

While in this unusual case the time to make such motions was extremely limited—the expert reports were exchanged on September 8, 2003 and Falkenberg's depositions taken on September 16, 2003 with trial commencing September 29, 2003—a motion to compel could have been presented to this Court on an emergency basis. MCG PCS made no effort to bring such a motion; nor did it introduce any evidence that it made any informal requests for more adequate disclosures. Accordingly, the motion to strike for failure to fully

---

**2.** Federal Rule 26(a)(2)(B) is identical to Federal Rule Bankruptcy Procedure 7026(a)(2)(B), which applies in Bankruptcy cases.

comply with Rule 26(a)(2)(B) has been waived.

■ In contrast, MCG PCS' objection to Falkenberg's use of confidential information to determine the appropriate discount to Auction 35 prices is not a mere Rule 26 objection. Rather MCG PCS' objection invokes this Court's "gatekeeping" functions assigned to trial courts by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and extended to include all non-scientific experts by *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■ In *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786, the Supreme Court identified four flexible, nonexclusive factors for determining whether the expert's opinion is sufficiently reliable: (1) whether the theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) when a particular technique is used, whether there is a known or potential rate of error; and (4) the extent of acceptance of the theory in the relevant scientific community. Further, in *Kumho Tire*, 526 U.S. at 158, 119 S.Ct. 1167, the Supreme Court instructed that a trial court is to use its discretion to determine what are the reasonable criteria of reliability and whether the proposed testimony meets those criteria based on the circumstances of that case. Finally, as observed by the Supreme Court in *Bragdon v. Abbott*, 524 U.S. 624, 653, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), in assessing reliability the court must determine whether the expert testimony has "a traceable, analytical basis in objective fact."

■ In the particular circumstances of this case, we have a valuation expert who is valuing the Debtors' license portfolio based on a comparable license sale analysis. As more fully set forth above, Falkenberg testified each of the licenses was discounted by a different percentage to Auction 35 prices based upon the managing director's initial judgments applying the four criteria that impact value. Thereafter, Falkenberg made additional adjustments based upon his personal knowledge of actual price information that he was aware of. Some of this price information was public information; some of it was not.

At trial, Falkenberg testified the confidential information was consistent with the other assumptions in his report, stating:

A. Those computations do include proprietary information, and I mean, they track extremely well with the assumptions throughout the report.

[R.T. 108:25–109:3] Of course, this testimony and the underlying assumptions were never able to be tested by cross-examination. Federal Rule of Evidence 702 requires that (1) the opinion be based on sufficient facts or data; (2) the testimony be the product of reliable principles and methods; and (3) the witness applied the principles and methods reliably to the facts of the case.[3] Fed.R.Evid. 705 states that an expert may be required to disclose the underlying facts or data on cross-examination. However, because of confidentiality agreements, Falkenberg declined to do so at his deposition and continued in his refusal at trial.

■ The Court is left with a report which inextricably relies on confidential information for the conclusions reached by the witness. Falkenberg could have excluded this information entirely in reaching his analysis of value. Alternatively, he

---

**3.** Fed.R.Evid. 702's second requirement is not in dispute here as the comparable sales analysis is well-established as a valuation method.

could have valued the confidential transactions at full Auction 35 prices to remove the confidentiality infirmity.[4] The Court and MCG PCS are left with the bare option of, to paraphrase, to trust but not to verify. Although this evidence may be probative, its probative value is substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403. To cure would cause undue delay and result in presentation of cumulative evidence.[5] As stated in *Kumho Tire*, opinion evidence that is connected to existing data only by the *ipse dixit* of the expert should not be admitted. 526 U.S. at 157, 119 S.Ct. 1167.

Further, the Court rejects the Debtors' argument of non-materiality of the confidential information. Falkenberg possessed confidential information concerning eighteen of the Debtors' ninety nine licenses. This means Falkenberg used confidential information which cannot be tested for roughly 18% of the Debtors' license portfolio. It is irrelevant that Falkenberg now states that the confidential information caused him to adjust only three of the eighteen licenses—he claims he downward adjusted one license and upward adjusted two.[6] It is possible more of the licenses should have been adjusted and the upward adjustments increased.

Finally, the Court is cognizant that Falkenberg's overall opinion of value is generally consistent with the expert opinion submitted by the Vendor Debt Holders, and although the report is not in evidence, with the opinion of MCG PCS' own valuation expert (which MCG PCS withdrew.) The Court declines Debtors' invitation to use these other expert opinions to establish the non-materiality of the confidential information used by Falkenberg. To do so would condone the Debtors' clear violation of the disclosure obligations of Rule 26(a)(2)(B), which was added to eliminate a litigant's ability to claim that materials furnished to their experts are privileged or otherwise protected when their expert witness is testifying or being deposed.[7] Further, that practice would encourage the hiring of multiple experts to validate each other's methodology and conclusions, thereby increasing the costs and expense of trials to the parties and the Court.

## IV.

### CONCLUSION

The motion to strike is granted. The expert report and testimony of Bruce Falkenberg is stricken. Falkenberg relied upon confidential information in preparing his report and in arriving at his conclusion

4. In fairness, given the late challenge to the reliance on confidential information, the witness did not have an opportunity to revise or recalculate his report in this manner. However, at this juncture reopening the evidence to allow him to cure would cause much delay and the Debtors are anxious to proceed with their remaining evidence in support of confirmation of the Plan.

5. The Informal Vendor Debt Committee has also submitted expert testimony in support of an opinion of the value of the Debtors' FCC licenses. That report has been admitted, subject to challenges raised by MCG PCS as to the weight this Court should give it.

6. *See* Debtors' Brief in Support of Admissibility of Falkenberg's Expert Valuation Report filed October 7, 2003. This brief is not accompanied by a declaration from Mr. Falkenberg.

7. *See* Advisory Comment to the 1993 Amendments to Fed.R.Civ.P. 26 (explaining: "[t]he report is to disclose the data and other information considered by the expert .... Given this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions ... are privileged or otherwise protected from disclosure when such persons are testifying or being deposed.").

the Debtors' license portfolio should be discounted an average of 70% to Auction 35 pricing. It denied MCG PCS the right to cross-examine Falkenberg concerning his entire methodology. Further, it prevented the Court from performing the "gatekeeping" functions which it must perform to admit his testimony. Counsel for MCG PCS is directed to prepare and lodge an order in accordance with this decision within 10 days of its entry.