HUGHES AIRCRAFT COMPANY; National Union Fire Insurance Company, Plaintiffs–Appellants,

v.

NORTH AMERICAN VAN LINES, INC., and Does 1–100, inclusive, Defendant–Appellee.

No. 91–15352.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 15, 1992.

Decided July 14, 1992.

**610**

Geoffrey A. Beaty, Fisher & Hurst, San Francisco, Cal., plaintiffs-appellants.

Gordon D. McAuley, Reisinger & Rogers, San Rafael, Cal., for defendant-appellee.

Before: FLETCHER, POOLE and BRUNETTI, Circuit Judges.

POOLE, Circuit Judge:

Plaintiffs Hughes Aircraft Company and National Union Fire Insurance Company appeal a grant of summary judgment in favor of defendant North American Van Lines. Hughes and National Union contend that North American did not follow the statutory procedure for limiting its liability for damages to certain cargo shipped by Hughes. Plaintiffs also argue that they should be permitted to pursue a state law negligence cause of action against North American. We have jurisdiction pursuant to 28 U.S.C. § 1291. We disagree with both of plaintiffs' arguments and affirm the district court's judgment.

*FACTS*

On March 1, 1987 Hughes Aircraft Company and North American Van Lines agreed to a contract under which North American would transport household products for Hughes employees and certain "high value" products for the aerospace firm. After North American responded to a proposal for a "contract carriage" arrangement, Hughes and North American negotiated the terms of the contract "at arm's length." The agreement was set forth in the form of a Hughes "Corporate Purchase Agreement." Included in the contract was an attached provision requiring North American to indemnify Hughes for damages that might occur during shipment of transported items. This indemnity attachment was expressly incorporated into the contract. The contract established a tariff (required by the Interstate Commerce Commission) for the transport of "high value" goods. The parties also agreed that North American would provide a discount from this tariff. The tariff tables, which reflected the discounted rate, specified a per-pound shipping charge and included a footnote at the bottom of each page that purported to limit North American's liability for damages to $.60 per pound per article.

Pursuant to the contract, Hughes in September 1987 contacted North American's local agent, Century Valley North American Van Lines of Huntington Beach, California, to arrange transportation of a mainframe computer owned by EDS, Inc. and leased by Hughes. The computer was comprised of fifteen to twenty pieces and weighed approximately 25,000 pounds. Hughes required transport of the computer from Texas to California. In connection with its transportation requirement Hughes asked North American to provide a tractor-trailer for its exclusive use and to assign two drivers to the shipment. North American agreed to these requests.

One of the assigned drivers shortly thereafter terminated his employment with North American and the remaining driver assumed sole responsibility for the transportation of the computer from Texas to

California. That driver, however, exceeded the limitations on working hours for the eight days prior to the Hughes shipment. The lengthy hours apparently exhausted the driver, for he fell asleep at the wheel of the truck during the interstate drive. The resulting accident near Tucson, Arizona caused substantial damage to the EDS computer system. As a result of the accident, Hughes became liable to EDS for the value of the computer and eventually settled EDS' claim for $2.5 million. The deprivation of access to the computer also caused Hughes to suffer business interruption losses in excess of $250,000.[1]

North American offered Hughes $12,408 as compensation for the damages suffered when the truck overturned. Hughes rejected this offer and subsequently sued in state court for breach of contract, negligence, and recovery under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11707. North American removed the case to the Northern District of California and later moved for summary judgment on the grounds that the contract validly limited its liability and the Carmack Amendment preempted Hughes' state common law claims. The district court granted North American summary judgment, 758 F.Supp. 555 and this timely appeal followed.

## DISCUSSION

Hughes tenders two principal arguments: first, that the district court incorrectly held that North American fulfilled the statutory requirements for limiting its liability for damages to the computer; and second, that the district court improperly held that Hughes' state common law claims against North American were preempted by the Carmack Amendment to the Interstate Commerce Act.

---

**1.** North American does not dispute that the computer was seriously damaged in the accident and that the financial measure of those damages far exceed the figure obtained by multiplying 25,000 pounds by the $.60 per pound liability limit specified in the tariff tables of the contract. No Hughes-owned cargo was damaged in the accident.

### A. *Standard of Review*

A grant of summary judgment is reviewed de novo. *Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989). We must determine, viewing the evidence in the light most favorable to the non-moving parties, whether there are any genuine issues of material fact in dispute and whether the district court correctly applied the relevant law. *Tzung v. State Farm Fire & Cas. Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989).

### B. *Did North American Limit its Liability?*

■ The Carmack Amendment, 49 U.S.C. § 11707(a), (c), subjects a motor carrier transporting cargo in interstate commerce to absolute liability for "actual loss or injury to property." *See Missouri Pacific R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964); *Underwriters at Lloyds of London, Inc. v. North American Van Lines*, 890 F.2d 1112, 1115 (10th Cir.1989) (en banc). However, a carrier may limit its liability for any such damage pursuant to 49 U.S.C. § 10730, which provides that

> [t]he Interstate Commerce Commission may require or authorize a carrier ... to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation.

■ Before a carrier's attempt to limit its liability will be effective, the carrier must (1) maintain a tariff in compliance with the requirements of the Interstate Commerce Commission;[2] (2) give the ship-

---

**2.** The Interstate Commerce Commission allows a carrier to file one or more tariffs that set forth terms and conditions of shipment, available freight rates, and other relevant information (including any applicable liability limitations). To effectively limit its liability in a filing with the ICC, a carrier must list with each rate listed in the tariffs a "released rate," which is the maximum dollar liability per unit of weight for

per a reasonable opportunity to choose between two or more levels of liability; (3) obtain the shipper's agreement as to his choice of carrier liability limit;[3] and (4) issue a bill of lading prior to moving the shipment that reflects any such agreement. *Rohner Gehrig Co., Inc. v. Tri–State Motor Transit,* 950 F.2d 1079, 1081 (5th Cir. 1992) (en banc); *Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1415 (7th Cir. 1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988). The carrier has the burden of proving that it has complied with these requirements. *Carmana Designs, Ltd., v. North American Van Lines, Inc.,* 943 F.2d 316, 319 (3d Cir.1991); *Flying Tiger Line v. Pinto Trucking Serv.,* 517 F.Supp. 1108, 1112 (E.D.Pa. 1981).

■ Hughes argues that requirements (2) and (3) were not met because it never chose to allow North American to limit its exposure to damages liability to the computer.[4] In fact, according to Hughes, the contract expressly obligated North American to indemnify Hughes for damages to the EDS-owned computer. The district court held that the parties negotiated North American's $.60 per pound liability limitation and that the terms of the indemnity attachment to the contract could not contradict that agreed upon limit because it was contained in North American's tariff. In support of this holding, the district court cited *Lowden v. Simonds–Schields–Lonsdale Grain Co.,* 306 U.S. 516, 59 S.Ct. 612, 83 L.Ed. 953 (1936).

■ Hughes argues that *Lowden* does not control this case because the filing of a tariff alone does not support a finding that a carrier's liability is limited. Hughes is correct. The filing of a tariff *alone* does not limit the carrier's liability; the shipper must be given a "reasonable opportunity" to choose to accept the carrier's proposed limit. *See Anton v. Greyhound Van Lines, Inc.,* 591 F.2d 103, 108 (1st Cir.1978); *W.C. Smith, Inc. v. Yellow Freight Systems, Inc.,* 596 F.Supp. 515, 517 (E.D.Pa. 1981). "A reasonable opportunity to choose between different levels of coverage means that the shipper had both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice." *Carmana Designs,* 943 F.2d at 320 (quoting *Bio–Lab, Inc. v. Pony Express Courier Corp.,* 911 F.2d 1580, 1582 (11th Cir.1990)). The agreement must evidence an "absolute, deliberate and well-informed choice by the shipper." *Bio–Lab,* 911 F.2d at 1583 (quoting *Anton,* 591 F.2d at 108).

■ Here, Hughes had such reasonable notice and an opportunity to make a deliberate, thoughtful choice in selecting North American's liability limit because it drafted the contract and directly negotiated its terms. The party responsible for drafting the contract is ordinarily charged with knowledge of its terms and meaning. *American Ry. Express Co. v. Daniel,* 269 U.S. 40, 42, 46 S.Ct. 15, 15–16, 70 L.Ed. 154 (1925); *Anton,* 591 F.2d at 108. Hughes made no offer of proof tending to show a lack of knowledge of $.60 per pound liability limit. In fact, Hughes apparently requested the lower release value. In addition, the contract incorporated tariff 404B, which established rates based on a $5.00 per pound release value. *See Denby v. Seaboard World Airlines,* 737 F.2d 172, 186–87 (2d Cir.1984) (tariff is incorporated into every transportation contract). Hughes knew of the availability of this higher release value. The contract's at-

---

which the carrier will be liable in the event of damage to the cargo. *See Rohner Gehrig Co., Inc. v. Tri–State Motor Transit,* 950 F.2d 1079, 1082 (5th Cir.1992) (en banc).

**3.** This agreement must be in writing and must contain an "inadvertence clause," which specifies the "released rate" and states that such a rate will apply unless the shipper expressly declares otherwise. *Rohner Gehrig,* 950 F.2d at 1082.

**4.** Hughes does not dispute that North American complied with requirements (1) and (4). The fact that the bill of lading was signed by an EDS employee, not a Hughes agent, is irrelevant because Hughes knew of the $.60 per pound limit. *See Boeing Co. v. U.S.A.C. Transport, Inc.,* 539 F.2d 1228, 1231 (9th Cir.1976); *Mechanical Technology Inc. v. Ryder Truck Lines, Inc.,* 776 F.2d 1085, 1087–88 (2d Cir.1985).

tached rate lists incorporated the discounts provided Hughes in return for the lower release value on "high value" shipments and clearly indicated that the discounted rates applied under the assumption that the $.60 per pound limitation applied.

■ The "indemnity" form, also an attachment to the contract, does not clearly indicate that this liability limitation is inapplicable to "high value" goods. It merely states that "Seller [would] indemnif[y] and . . . hold Buyer harmless from and against all liabilities. . . ." Hughes has offered no evidence to support its assertion that this indemnity clause trumps the rate schedule's limit on liability except for the contract's precedence provision, which states that "special" or "general" terms control in the event of a conflict with "Purchase Order General Provisions." In addition, there is no inherent conflict between the indemnity attachment and the rate schedule because the attachment can reasonably be read to require North American to indemnify Hughes only to the extent of its liability limit. *See Cooperative Shippers, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.*, 613 F.Supp. 788, 795 (N.D.Ill.1985) (ambiguities are construed against party that drafted the indemnity form).

■ Even if the indemnity agreement does directly contradict the release value specified in the contract, however, it cannot be given effect because the release rates constitute part of the tariff. Any conflict within the contract to the tariff's terms is void. *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, ——, 110 S.Ct. 2759, 2765–66, 111 L.Ed.2d 94 (1990); *Louisville & Nashville R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); *ICC v. Transcon Lines*, 968 F.2d 798 (9th Cir.1992). Accordingly, the precedence provisions of the contract did not prevent the district judge from concluding that no genuine issue of material fact as to the validity of the liability limitation existed.

**C. Is Hughes' Negligence Cause of Action Preempted by the Carmack Amendment?**

■ Hughes wisely concedes that federal law preempts any state common law action against North American acting solely as a common carrier. It is clear that the Carmack Amendment established a uniform national liability policy for interstate carriers. *New York, New Haven & Hartford RR Co. v. Nothnagle*, 346 U.S. 128, 131, 73 S.Ct. 986, 988, 97 L.Ed. 1500 (1953); *Adams Express Co. v. Croninger*, 226 U.S. 491, 505–06, 33 S.Ct. 148, 151–52, 57 L.Ed. 314 (1913). Hughes argues, however, that the Carmack Amendment does not preempt a state law negligence cause of action where the common carrier is operating on a *contract* basis. Hughes' argument is completely meritless.

49 U.S.C. § 10730(a) declares that a "carrier" may limit its liability for damages to cargo shipped under its care. The Interstate Commerce Act defines a "carrier" as "a common carrier and a contract carrier." 49 U.S.C. § 10102(2). The Interstate Commerce Act's explicit language therefore makes clear that any limits on liability that apply to common carriers also apply to common carriers acting as contract carriers. The fact that North American signed a contract to ship Hughes' goods does not remove its common carrier status. Such status "is determined not by reference to its authority but rather by reference to what [the trucker] holds itself out to be." *Ensco, Inc. v. Weicker Transfer*, 689 F.2d 921, 925 (10th Cir.1982). *See also Tokio Marine & Fire Ins. Co. v. Amato Motors, Inc.*, 770 F.Supp. 426, 428 (N.D.Ill.1991). Hughes tendered no offer of proof that North American offered certain services or failed to offer other services in a manner inconsistent with the common practice in the motor transport industry. *See Mass v. Braswell Motor Freight Lines, Inc.*, 577 F.2d 665, 667 (9th Cir.1978) (common carrier status determined by services offered by trucker, not by corporate character or declared purpose).[5] In any event, however,

---

**5.** Plaintiffs' citation to *Ensco, Inc. v. Weicker Transfer*, 689 F.2d 921 (10th Cir.1982), is un-

helpful. In *Ensco* the shipper had assumed many of the burdens of the transportation busi-

Hughes' theory is illogical. Most carriers presumably sign contracts of one sort or another when they undertake to transport cargo across state lines, which is not surprising since the carrier cannot limit its liability unless the shipper agrees in writing. *Glickfield v. Howard Van Lines*, 213 F.2d 723, 725 (9th Cir.1954). The district judge correctly granted summary judgment on this issue.

## CONCLUSION

The judgment of the district court is AFFIRMED.

ness normally handled by the carrier, including choosing the driver and advancing routine expenses for the interstate shipment at issue, provided specialized service not ordinarily made available to other customers, and followed billing practices inconsistent with standard industry practice. In addition, the trucker was not licensed as a common carrier by the Interstate Commerce Commission and did not hold itself out to be a common carrier. *Id.* at 926–27.

Since "carriage for hire" arrangements, including the leasing arrangement employed in by the parties in that case, are not controlled by the Carmack Amendment, the court concluded that the shipper's Carmack Amendment action must fail. *Id.* at 925–26. The court examined the shipper's remaining cause of action for the trucker's negligence and concluded that none had been demonstrated. *Id.* at 928.