**BULLOCKS EXPRESS TRANSPORTATION, INC. Plaintiff,**

**v.**

**XL SPECIALTY INSURANCE COMPANY fka Intercargo Insurance Company, et al, Defendants.**

No. 2:01–CV–00589 PGC.

United States District Court, D. Utah, Central Division.

Aug. 2, 2004.

Kim R. Wilson, Esq., Snow Christensen & Martineau, Salt Lake City, UT.

Mr. David W Slaughter, Esq., Snow Christensen & Martineau, Salt Lake City, UT.

David Krantz, Esq., Ostrove Krantz & Ostrove, Los Angeles, CA.

Mr. Michael E Dyer, Esq., Blackburn & Stoll LC, Salt Lake City, UT.

Donald J. Sands, Esq., Sands Lerner, Los Angeles, CA.

## ORDER AND MEMORANDUM OPINION GRANTING BULLOCKS EXPRESS TRANSPORTATION, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

CASSELL, District Judge.

This case is before the court on Bullocks Express Transportation, Inc.'s Motion for Partial Summary Judgment. The sole issue before the court is whether Bullocks Express effectively limited its liability to $5.00 per pound of a stolen shipment of palm pilots.

### BACKGROUND

Bullocks Express is a motor carrier providing interstate transportation of cargo for hire. Skyway Freight Systems, now bankrupt, was a domestic and international air freight and surface freight forwarder. On May 26, 1998, Bullocks Express and Skyway Freight Systems entered into an agreement entitled LTL Contract Agreement (hereinafter "LTL Agreement"). LTL is a shipping term and is shorthand for "less than truckload." The provisions of the LTL Agreement relevant to this motion provide:

NOW THEREFORE, the parties hereto hereby mutually agree as follows:

1. *TRANSPORTATION SERVICES*

Vendor [hereinafter Bullocks] agrees to provide Skyway with transportation ser-

vices consisting of pickup, transfer, transport, break-bulk and delivery at such times and place as may from time to time be required by Skyway or any authorized agent of Skyway . . . .

## 2. PERFORMANCE OF SERVICES

In performing services under this Agreement, [Bullocks] will direct the operation of all equipment in all respects and will determine the method, means and manner of performance . . . In handling shipments provided by Skyway, [Bullocks] shall be bound by Skyway's tariffs to the extent applicable relating to the delay, loss of, or damage to, shipments while in [Bullocks'] possession . . . .

## 4. ADDITIONAL SERVICES

Services not defined in this Agreement and attached schedules will be agreed upon by the parties prior to work being performed, in writing . . . .

## 5. VENDOR PERFORMANCE AND RESPONSIBILITIES

[Bullocks] and its employees must be fully knowledgeable about Skyway's services and documentation. [Bullocks] and its employees must abide by requirements and policies as outlined in Skyway's "Vendor Operating Policies", Schedule A.

## 13. VENDOR'S GENERAL AND INDEMNITY TO SKYWAY

[Bullocks] covenants and agrees to fully defend, protect, indemnify and hold harmless Skyway, its employees, and its agents from and against each and every claim, demand, or cause of action and any liability cost, expense (including but not limited to attorney's fees and expense incurred in defense of Skyway), damage, or loss in connection therewith, which may be made or asserted by

[Bullocks], [Bullocks'] employees or agents, sub-Vendors, or any third party resulting from:

(a) Injury to or death of persons, loss or destruction of or damage or delay to property, including the conversion thereof caused by, or resulting in any manner, from any acts or omissions negligent or otherwise, of [Bullocks] or any of [Bullocks'] agents, servants, or employees, in performing or failing to perform, or otherwise arising out of or in connection with, any of the services or duties of [Bullocks] to be performed under this Agreement . . . .

(d) Theft, embezzlement or defalcation on the part of [Bullocks], or any of [Bullocks'] agents or employees . . . .

## 16. VENDOR'S LIABILITY FOR FREIGHT

[Bullocks'] liability for freight handled hereunder, while in possession of [Bullocks], shall be that of an insurer and the records of Skyway as to condition of freight when tendered to [Bullocks] by Skyway or when Skyway shall receive freight from [Bullocks] shall be conclusive as between the parties hereto. [Bullocks] shall be liable to Skyway for any and all delays or losses of or damage to property transported for Skyway or its customers under the Agreement, while such property is in the possession of [Bullocks], to the same extent that Skyway may be liable. If [Bullocks] is found to be guilty of severe negligence as defined in the Schedule A of this document or if losses occur due to theft by [Bullocks'] employees or their agents, [Bullocks] shall be liable for the full invoice value of the products.

The agreement is signed by Bruce Bullocks, President of Bullocks' Express, and

Jason Stefanides, Manager of Skyway Freight Systems.

The relevant portions of the Schedule A attached to the LTL Agreement provide:

10.  Declaration of Value

[Bullocks'] liability for loss of or damage to all or any part of a shipment will be:

(a) Truck (TK) and Express Truck (XT) shipments—Released to a valuation not exceeding $5.00 per pound per package and to include all applicable freight charges . . . .

(c) The above valuations will apply other than the exception where a higher value is declared on the Skyway bill of lading at the time of receipt of the shipment. [Bullocks] must have prior approval from Skyway before accepting shipments having a declared value of $25,000.00 or more.

15.  Security

(a) [Bullocks'] is required to take all precautions to insure the security of Skyway's freight.

(b) Freight is to be staged in such a manner and location to keep it free from possible pilferage and theft.

(c) Freight and Vehicle must be secured in such a manner as to keep free from theft and damage whenever driver is not in attendance . . . .

16.  Severe Negligence

Severe negligence is defined as lacking or exhibiting a general lack of due care or concern, or omission or neglect of reasonable care, precaution, or action, in relation to the safety well-being and delivery of Skyway's entrusted freight, including failing to comply with Skyway policies on locking and securing vehicles and facilities. Severe negligence also includes but not limited to [sic] theft, robbery, pilferage of freight by the vendor, its agents or emplcyees.

On October 4, 1999, Skyway entered into an agreement with 3COM Corporation for the transportation of 3COM products. The cargo consisted of about 4,300 palm pilots. In its agreement with Skyway, 3COM set forth the security measures it expected of Skyway and third parties hired by Skyway. These security measures required storing the cargo in trailers parked in secured yards. Suggested security precautions included the use of pin locks and paddle locks on trailer doors. The palm pilots were to be shipped from Salt Lake City, Utah to four different locations according to the four Skyway bills of lading governing the transportation.

In each of these four Skyway bills of lading, Skyway declared the value of the goods to be "$0.00." In what is known as a "released value" provision, each of the bills of lading provide: "DECLARED VALUE. Unless a higher value is declare hereon, the agreed or declared value of the property is hereby stated by the shipper to be not exceeding $5.00 per pound per article . . . ." The bills of lading also provide:

Limit of Liability: Skyway Freight Systems' liability shall be limited to the lowest of the following: (a) The declared value of the shipment as shown on the shipping document or Skyway bill of lading. (b) The actual value of the shipment at the destination named on the shipping document or Skyway bill of lading. (c) The amount of any loss or damage actually sustained.

The cargo was located at Skyway's facility in Salt Lake City. Pursuant to an agreement with Bullocks, on November 26, 1999 a Bullocks' short-haul driver picked up the cargo from Skyway's consolidation center and took it to Bullocks' yard. The bill of lading for the shipment was prepared by Skyway. According to the bill of lading

the cargo weighed 15,813 pounds. The bill of lading further states:

> [E]very service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Bill of Lading set forth in the National Motor Freight Classification 100–X and successive issues. The shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Like the LTL Agreement, the bill of lading also contains a released value provision. It states: "Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property as follows: The agreed or declared value of the property is specifically stated by the shipper to be not exceeding _____ per _____." It is uncontested that although Skyway prepared the bill of lading, the declared value was left blank.

> The bill of lading also provides:

> [W]here a lower value than the actual value of the said property has been stated in writing by the shipper or has been agreed upon in writing as the release value of the property as determined by the classification or tariffs upon which the rate is based, such lower value plus freight charges if paid shall be the maximum recoverable amount for loss or damage, whether or not such loss or damage occurs from negligence.

Finally, the NMFC 100–X and successive issues, which the bill of lading states will govern the parties, provides:

> The released or declared value of the property must be entered on the shipping order and bill of lading at time of shipment in the following form: "The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per pound." If the shipper fails or declines to execute the above statement or designates a value exceeding $25.00 per pound, shipment will not be accepted, but if shipment is inadvertently accepted, it will be considered as being released to a value of $5.00 per pound and the shipment will move subject to such limitation of liability.

Bullocks and Skyway were both members of the National Motor Freight Classification ("NMFC") 100–X, 100–Y, and successive issues. Bullocks maintained a copy of these tariffs which were available upon request.

Bullocks' concedes that the cargo was stolen at some point during the one-hour span between the time Bullocks' short-haul driver picked up the load and the time Bullocks' long-haul driver arrived at the yard to begin the shipment to Carrolton, Texas. The issue before the court is whether the LTL Agreement applies to this transaction and, if so, whether the severe negligence clause in the LTL Agreement is preempted by the release value provision in the Bullocks bill of lading.

## DISCUSSION

### Does the LTL Agreement Apply to This Transaction?

■ Resolution of the issue presented here turns on the applicability of the "Severe Negligence" clause of the LTL Agreement entered into between the parties. Bullocks contends that the LTL Agreement is inapplicable because Skyway hired Bullocks to perform FTL services. LTL refers to "less than truckload" shipments and FTL refers to "full truckload" shipments. However, there is apparently

no uniform distinction between LTL and FTL services. The Fifth Circuit has described the distinction in language which may address what occurred in this case:

A freight forwarder is one who in the ordinary course of business assembles and consolidates small shipments into a single lot, assumes responsibility for the transportation of such property from a point of receipt to a point of destination, utilizes the services of carriers by rail, water or motor vehicle to help accomplish the movement, breaks the consolidated shipment up into its component parts, and distributes the goods to their destination point.

Since the original shipments are usually small, the customer is charged on a basis of freight rates applicable to less-than truckload ... shipments. The freight forwarder, who consolidates multiple small shipments into one large one, secures the cheaper transportation rate applicable to full truckload ... lots. The difference between the two freight rates accounts for his gross profit.[1]

Full truckload shipments are also usually taken directly to their final destination, whereas less than truckload shipments are taken to a distribution point, broken up, and then taken to their separate final destinations.[2]

The facts of this case also appear to present the consolidation of LTL shipments into an FTL shipment by a freight forwarder. In this case, Skyway contracted with 3COM with respect to four different loads, each at the lower LTL rate, and then hired Bullocks to ship the four loads to a single destination, at which point they were to be broken up again and taken by Skyway to each of the four intended destinations. The presumption behind this is that Skyway was paid LTL rates and made their profit by paying Bullocks FTL rates.

Other case law treats the LTL/FTL distinction as a matter of weight capacity or visual capacity. A "less than full truckload" shipment could mean a "shipment below full weight" unless it filled the "visual capacity" of the trailer and prevented consolidation of other less than truckload shipments.[3]

The standing agreement between the parties is titled "Skyway Freight Systems, Inc. LTL Contract Agreement." It does not define what the parties consider LTL or FTL services. Further, while labeled "LTL Contract Agreement," the language of the Agreement is not explicitly limited to LTL services. Under the heading "Transportation Services" the Agreement describes the services to be performed by

1. *Mercury Motor Express, Inc. v. Brinke*, 475 F.2d 1086, 1088–89 (5th Cir.1973); *see also, National Motor Freight Traffic Association v. United States of America*, 253 F.Supp. 661, 663 (D.D.C.1966) (describing a freight forwarder as one who "consolidates several small, less then truckload shipments into a full truckload ... which then moves over the major portion of the journey by common carrier at the lower truckload ... rate."); *Household Goods Carriers' Bureau v. United States of America*, 288 F.Supp. 641, 642 (D.C.Cal.1968) (same).

2. *International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 788–89 (2d Cir.1987); *see also Schneider Nat'l*

*Carriers Inc., v. Rudolph Express Co. Inc.*, 855 F.Supp. 270, 271 (E.D.Wis.1994) (describing consolidation of LTL's into FTL's which are then taken to a distribution point, divided into their original components, and delivered to their final destination).

3. *Jetco Inc. v. United States of America*, 11 Cl.Ct. 837, 840 (Mar. 2, 1987); *see also Advanced Distribution System, Inc. v. United States of America*, 34 Fed. Cl. 598, 605 (Dec. 15, 1995)("a full truckload shipment means simply that the carrier may not add other cargo because the shipment occupies the truck's full capacity").

Bullocks: "Vendor agrees to provide Skyway with transportation services consisting of pickup, transfer, transport, break-bulk and delivery at such times and place [sic] as may from time to time be required by Skyway or any authorized agent of Skyway." These services could describe both LTL and FTL services. However, the Agreement also contemplates "Additional Services" which are "not defined in this agreement" which would "be agreed upon [in writing] by the parties prior to work being performed ...." Arguably, this could refer to FTL services.

The court finds that there is a genuine issue of material fact as to whether or not the services performed by Bullocks in this case were LTL or FTL services and whether the parties intended the LTL Agreement to govern the services involved. Bullocks points out that the Agreement is labeled as an LTL Agreement, the presumption being that it would not apply to FTL services, and that the Agreement refers to additional services, not defined, which must be agreed to in a separate writing. In addition, the facts of the case suggest that Skyway acted as a typical freight forwarder, contracting to consolidate several LTL shipments into an FTL shipment and making a profit by being paid the higher LTL rates while paying Bullocks the lower FTL rates.

On the other hand, XL argues that the LTL Agreement contains no substantive provisions limiting its application to LTL shipments, but instead speaks in general language. Further, the LTL Agreement speaks of "linehaul" delivery, which typically refers to full truckload shipments.

XL also puts forth an affidavit by Robert Walters, the CEO of Freight Management, Inc., who was hired by XL to investigate this matter. In his affidavit Mr. Walters states that most shippers do not distinguish between LTL and FTL services.[4] Mr. Walters also states that the 28.5′ truck used by Bullocks "is commonly referred to as a 'half-set of doubles' and is always an 'LTL' or less than truckload movement of freight ...."[5] Bullocks also apparently holds itself out to the public as "the premier service carrier of LTL ... shipments in its region" and the profile section of its website refers only to LTL services.[6] XL also proffers as evidence that this was not an FTL shipment the fact that in 1999 Bullocks was not on the NMFC list of FTL carriers.[7] Finally, Bullocks has not put forward any evidence that they were paid at an FTL rate for the shipment.

On a motion for summary judgment, the court must "review the factual record and draw any reasonable inferences in the light most favorable to the nonmoving party."[8] XL has identified "specific facts posing genuine issues of material fact."[9] Therefore, summary judgment on this issue would be inappropriate.

### Does the Carmack Amendment Preempt the Serious Negligence Clause in the LTL Agreement?

■ Bullocks argues in the alternative that even if the LTL Agreement applies to this transaction, the "Severe Negligence" clause is preempted by the Carmack Amendment and cannot be applied. Bullocks argues that the Released Value Doctrine mandates that their potential liability

4. Affidavit of Robert Walters at ¶ 6.

5. Supplemental Affidavit of Robert Walters at ¶ 19.

6. *Id.* at ¶¶ 13–15.

7. *Id.* at ¶¶ 16–18.

8. *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 982 (10th Cir.2002).

9. *Id.*

be limited to $5.00 per pound of the shipment rather than the full value of the shipment.

The court finds that the Carmack Amendment [10] preempts the "Severe Negligence" clause and that the sole remedy against Bullocks is through the released value provision of the Bullocks bill of lading. The Carmack Amendment was enacted in 1906 as an amendment to the Interstate Commerce Act of 1887.[11] The Carmack Amendment "deals with the familiar and historic subject of carrier liability for goods lost or damaged in shipment." [12] The Carmack Amendment places such strict limits on carrier liability that " '[a]lmost every detail of the subject is covered so completely that there can be no rational doubt that Congress intended to take possession of the subject, and supersede all state regulation with reference to it . . . .' " [13]

The relevant portion of the Carmack Amendment states:

A carrier providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States . . . Failure to issue a receipt of bill of lading does not affect the liability of the carrier.[14]

The Carmack Amendment has broad preemptive effects on the liability of carriers. The Supreme Court has stated that the

duty to issue a bill of lading and the liability thereby assumed, are covered in full, and though there is no reference to the effect upon state regulation, it is evident that Congress intended to adopt a uniform rule and relieve such contract from the diverse regulation to which they had been theretofore subject.[15]

The Carmack Amendment so thoroughly regulates carrier liability that "every circuit which has considered the matter . . . has either held or indicated it would hold that the Carmack Amendment preempts state common law remedies against a carrier for negligent damage to goods shipped under a proper bill of lading." [16] This broad preemption covers not only common law negligence claims, but also claims for breach of contract. As the Eighth Circuit has stated,

the Carmack Amendment was intended by Congress to create a national uniform policy regarding the liability of carriers under a bill of lading for goods lost or

---

10. 49 U.S.C.

11. *Underwriters at Lloyds of London v. North American Van Lines*, 890 F.2d 1112, 1115 (10th Cir.1989).

12. *Id.*

13. *Id.* at 1116 (quoting *Adams Express Co. v. Croninger*, 226 U.S. 491, 505, 33 S.Ct. 148, 57 L.Ed. 314 (1913)).

14. 49 U.S.C. § 14706(1).

15. *Underwriters*, 890 F.2d at 1116 (quoting *Adams Express*, 226 U.S. at 506, 33 S.Ct. 148).

16. *Underwriters*, 890 F.2d at 1120.

damaged in shipment. Allowing a shipper to bring common law breach of contract or negligence claims against a carrier for such loss or damage conflicts with this policy." [17]

The strict liability of carriers under the Carmack Amendment proved burdensome to interstate commerce as carriers were liable for the "actual loss" of vendors when goods were damaged, even where those goods were fully insured. As a result, carriers were forced to raise their rates to make up for the losses. To solve this problem, Congress enacted the Cummins Amendment. This Amendment allowed shipper's to pay lower rates to carriers by declaring a lower value for the goods, thereby limiting the potential liability of the carrier. The relevant portion of this statute provides:

> [A] carrier providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 may ... establish rates for the transportation of property ... under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and the shipper if that value would be reasonable under the circumstances surrounding the transportation.[18]

This "released value" provision makes the broad preemptive effect of the Carmack Amendment even more necessary. Without preemption, a shipper who had negotiated a lower freight rate by declar-

ing a lower value for the goods could file a negligence suit in state court for the full amount of the goods rather than the declared value. "[I]t would be unjust to permit a shipper to obtain a lower rate by contracting to limit the carrier's liability, and then avoid that limitation through a common law negligence action." [19]

The sum of the law of preemption in this area is that " '[a] shipper who brings a negligence action may not recover in excess of the amount specified in the receipt or bill of lading.' " [20] This is true even in a case such as this where the parties have an additional contract outside of the bill of lading. "The [case law] make[s] it clear that when damages are sought against a common carrier for failure to properly perform, or for negligent performance of, an interstate contract of carriage, ... a tort action does not lie." [21]

Thus, a carrier can limit its liability by charging a lower rate in exchange for the shipper declaring a lower value on the goods. But, in order to take advantage of this provision the carrier must "provide ... to the shipper, on request of the shipper, a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based." [22]

The Tenth Circuit, in addressing the released value provision, has stated:

> A carrier may limit its liability by taking four steps: (1) maintain a tariff within the prescribed guidelines of the

17. *Shao v. Link Cargo (Taiwan) Ltd.*, 986 F.2d 700, 707 (8th Cir.1993).

18. 49 U.S.C. 14706(c)(1)(A).

19. *Underwriters*, 890 F.2d at 1117.

20. *Id.* at 1120 (quoting *Hopper Furs, Inc. v. Emery Air Freight Corp.*, 749 F.2d 1261, 1264 (8th Cir.1984)).

21. *Underwriters*, 890 F.2d at 1120 (quoting *American Synthetic Rubber Corp. Louisville & Nashville R.R. Co.*, 422 F.2d 462, 466, 468 (6th Cir.1970)).

22. 49 U.S.C. 14706(c)(1)(B).

Interstate Commerce Commission; (2) obtain the shipper's agreement as to his choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment.[23] Since the ICC no longer exists, the first requirement has been replaced with the requirement that "a carrier ... provide a shipper with the carrier's tariff if the shipper requests it, instead of the shipper filing its tariff with the now-defunct ICC." [24]

The bill of lading for the shipment involved in this case was prepared by Skyway. It provides:

It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at anytime interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Bill of Lading set forth in the National Motor Freight Classification 100–X and successive issues. The shipper [Skyway] hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Bullocks and Skyway are both members of the National Motor Freight Classification ("NMFC") 100–X, 100–Y, and successive issues. The NMFC contains the published rules, regulations and classifications for participating members, and serves the same purpose as the published tariffs did under the old I.C.C. rules. Bullocks maintained a copy of the NMFC 100–X, 100–Y and successive issues and made its tariff available to shippers upon request. In addition, both the bill of lading and the NMFC 100–X and 100–Y provide a space for the shipper to make a declaration of value. Skyway declined to do so. The tariff states that where the shipper fails to make a declaration of value, liability is limited to $5.00 per pound. Skyway may have never requested a copy of Bullocks tariff. However, "the shipper is charged with knowledge of the terms and conditions of the tariff, particularly if the shipper is experienced." [25]

In addition, the bill of lading, which also contained a space for Skyway to make a declaration of value, was prepared by Skyway. Thus, there was clearly " 'reasonable notice of the opportunity to declare a higher value' " since notice may be provided "by language on the face of the bill of lading." [26] Further, " 'where the shipper drafted the bill of lading and incorporated industry specific terminology which ... undisputably includes a limitation of liability' the shipper cannot avoid the liability limitation even if the shipper did not know what the industry term meant." [27] At oral arguments in this matter, counsel for XL conceded that Skyway intentionally chose not to place a value in the released value clause in the bill of lading. This was perhaps because of a mistaken belief that the LTL Agreement fully covered the issue. XL now seeks to recover the full invoice

**23.** *Norton v. Jim Phillips Horse Transp., Inc.,* 901 F.2d 821, 827 (10th Cir.1989).

**24.** *Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.,* 331 F.3d 834, 841 (8th Cir.2003).

**25.** *Norton,* 901 F.2d at 824.

**26.** *Id.* at 825 (quoting *Husman Constr. Co. v. Purolator Courier Corp.,* 832 F.2d 459, 461 (8th Cir.1987)).

**27.** *Sassy Doll,* 331 F.3d at 839 (quoting *Siren, Inc. v. Estes Express Lines,* 249 F.3d 1268, 1272 (11th Cir.2001)).

value of the cargo. However, counsel also conceded at oral arguments that had Skyway declared the full invoice value on the bill of lading, Bullocks would never have accepted the shipment.

In sum, Bullocks maintained a tariff which was available upon request, obtained Skyway's choice as to limitation of liability, gave Skyway reasonable notice of the opportunity to choose a higher value, and issued a bill of lading prior to shipment. This meets all of the requirements for enforcement of a released value provision.

■ XL argues that the released value provision is void because Bullocks failed to classify the cargo. However, XL has set forth no case law stating that classification is a requirement. Further, Skyway had actual knowledge of what the cargo was and prepared the bill of lading itself. Additionally, " 'shippers [are] responsible for determining the conditions imposed on the transportation of a shipment.' "[28] The responsibility to set the desired conditions for shipment was on Skyway.

Additionally, the LTL Agreement itself states that Bullocks would be liable "to the same extent that Skyway may be liable" unless found guilty of "severe negligence" as defined in Schedule A of the LTL Agreement. In the four bills of lading issued between 3COM and Skyway, 3COM declared the value of the goods to be $0.00, thus setting liability for Skyway at the lowest possible level. XL is attempting to recover more from Bullocks than 3COM could recover from Skyway.

■ Nor can the "Severe Negligence" clause be applied here. XL argues that

the LTL Agreement is essentially a supplement to the bill of lading—part of the contract between the parties. However, when a bill of lading is issued as a part of an interstate shipping transaction, the Carmack Amendment requires that liability is governed solely by the declared value in the bill of lading. This case is similar to the Ninth Circuit case of *Hughes Aircraft Co. v. North American Van Lines.*[29] In that case, the court refused to allow North American to enforce an indemnification clause which was a part of the contract of carriage where North American had also declared a $.60 per pound value for the goods. Hughes argued that "the contract expressly obligated North American to indemnify Hughes for damages ..."[30] The district court agreed with Hughes, finding that the "$.60 per pound liability limitation and that the terms of the indemnity attachment to the contract could not contradict that agreed upon limit because it was contained in North American's tariff."[31] However, the Ninth Circuit rejected Hughes' argument for full recovery because Hughes "had ... reasonable notice and an opportunity to make a deliberate, thoughtful choice in selecting North American's liability limit because it drafted the contract and directly negotiated its terms ... Hughes knew of the availability of [a] higher release value" and chose not to adopt it in the declaration of value.[32] In the end, the Ninth Circuit interpreted the indemnity provision to only indemnify Hughes up to the declared value in the tariff. However, the court stated that "if the indemnity agreement does directly contradict the release value specified in the contract ... it cannot be given effect

28. *Sassy Doll,* 331 F.3d at 841 (quoting H.R. Conf. Rep. No. 104–422, at 223 (1995) *reprinted in* 1995 U.S.C.C.A.N. 850, 908) (emphasis added).

29. 970 F.2d 609 (9th Cir.1992).

30. *Id.* at 612.

31. *Id.*

32. *Id.*

because the release rates constitute part of the tariff. *Any conflict within the contract to the tariff's terms is void.*[33]

In this case the bill of lading also arguably incorporates the severe negligence clause by referring to other "contracts that have been agreed upon in writing between the carrier." As in *Hughes,* if the severe negligence clause did not raise the recovery permitted by the declared value on the bill of lading, it could be given effect. However, under the preemptive effect of the Carmack Amendment, "[a]ny conflict within the contract to the tariff's terms is void."[34] Therefore, the declared value in the bill of lading and its governing tariff trump the LTL Agreement. A shipper simply cannot declare a value in the bill of lading and then get around it through a second provision which allows a greater recovery.

XL argues that *Hughes* is distinguishable because the indemnification clause in that case allowed full recovery under all circumstances, directly contradicting the declared value, whereas the severe negligence clause in this case merely supplements the declared value by only allowing full recovery under special circumstances. The court is not persuaded that this distinction is sufficient. First, the declared value in effect sets the maximum value for the goods so that the "actual loss" under the Carmack Amendment is absolutely limited to the declared value. In essence, as soon as a value is declared, that value becomes the full value of the goods. Second, it is clear that the severe negligence clause does contradict the bill of lading. As noted above, the bill of lading provides that the declared value "shall be the *maximum* recoverable amount for loss or damage, whether or not such loss or damage occurs from negligence." To be sure, the bill of lading refers to only "negligence" and not "severe negligence." But, the definition of "severe negligence" in Schedule A of the LTL Agreement is hardly severe: "Severe negligence is defined as lacking or exhibiting a *general lack of due care or concern,* or omission or neglect of *reasonable care,* precaution, or action, in relation to the safety well-being and delivery of Skyway's entrusted freight ..." Negligence can hardly be distinguished from severe negligence by a lack of *reasonable* care since any time a person acts reasonably they are presumably not acting negligently. The effect of the *severe* negligence clause would in effect be to allow fully insured goods to be recovered for in full a second time whenever *any* negligence was demonstrated.

It is also true that in this case Skyway did not declare a value on the bill of lading, instead choosing to leave it blank. In this respect this case falls squarely within cases such as the Tenth Circuit's decision in *Norton v. Jim Phillips Horse Transportation, Inc.,*[35] and the Seventh Circuit case of *Hughes v. United Van Lines, Inc.*[36] The Eleventh Circuit, describing these and other similar cases, stated:

> The theory behind those cases is unremarkable: If the shipper fails to fill in the blanks on the bill of lading, there is no 'value established by written or electronic declaration of the shipper.' 49 U.S.C. § 14706(c)(1)(A). Because the shipper is charged with notice of the carrier's tariff, a provision in a tariff which limits liability to a certain amount absent a declaration of value in the bill of lading constitutes a 'written agree-

---

**33.** *Id.* at 613 (emphasis added).

**34.** *Id.*

**35.** 901 F.2d 821.

**36.** 829 F.2d 1407.

ment between the carrier and the shipper,' *id.*, limiting the carrier's liability to the value provided in the tariff ... *In that situation, the declared value box provides the reasonable opportunity to choose a higher level of liability, and the shipper's expectation that the carrier would be fully liable for any potential loss despite a failure to declare the actual value of the shipment is no more than a unilateral mistake.*[37]

While the bill of lading in this case vaguely refers to other contracts, it specifically refers to, and states that the "services to be performed hereunder" are "subject to all the terms and conditions of the Uniform Bill of Lading set forth in the National Motor Freight Classification 100–X and successive issues." As an experienced shipper, Skyway is charged with knowledge of the tariff and, in any event, the bill of lading states that Skyway "is familiar with the terms and conditions" of the tariff. Moreover, Skyway was free to request the tariff at any time. The tariff clearly states that where the shipper fails to declare a value, the value will be set at $5.00 per pound. " '[I]t is neither just nor equitable that [a shipper] shall benefit by the lower rate, and then recover for a value which he said did not exist, in order to obtain that rate.' "[38]

XL quotes language from the Department of Transportation that bills of lading "may be subject to a master contract of carriage between the shipper and the carrier" and that "negotiated bills of lading are virtually never used in U.S. motor carriage because transportation occurs too quickly to make negotiation feasible."[39]

This is undoubtedly true, however, it does not impact the holding of the court. Assuming this was an LTL shipment, the LTL Agreement might govern the parties conduct insofar as it did not conflict with the Carmack Amendment. But, pursuant to the Carmack Amendment, the declared value provision on the bill of lading absolutely governs the liability of the carrier and any separate provision which attempts to establish a higher value is void. The purpose of the Carmack Amendment was to determine the exact potential liability of the carrier beforehand.

> The valuation declared or agreed upon as evidenced by the contract of shipment upon which the published tariff rate is applied, must be conclusive in an action to recover for loss or damage a greater sum ... To permit such a declared valuation to be overthrown by evidence *aliunde* the contract, for the purpose of enabling the shipper to obtain a recovery in a suit for loss or damage in excess of the maximum valuation thus fixed, would both encourage and reward undervaluations and bring about preferences and discriminations forbidden by the law.[40]

Therefore, the declared value provision sets the liability of the carrier. It is undisputed in this case that Skyway chose to leave the declaration of value blank and that the tariff, specifically incorporated into the bill of lading, sets the maximum liability at $5.00 per pound. Any separate provision contradicting the tariff is *per se* void.

---

37. *Sassy Doll*, 331 F.3d at 842.

38. *Underwriters v. North American Van Lines*, 890 F.2d at 1118 (citation omitted).

39. U.S. Dep't of Transportation, *Cargo Liability Study* at 39 (August, 1998) *available at*

http://ostpxweb.dot.gov/policy/Data/cargolivab.pdf

40. *Underwriters*, 890 F.2d at 1118 (citations omitted).

1259

■ Finally, the court also rejects XL's contention that the Carmack Amendment does not apply because the loss occurred in a "terminal area."[41] The terminal area exemption provides:

> Neither the Secretary of Transportation nor the Surface Transportation Board ("STB") have jurisdiction over transportation by motor vehicle in a terminal area when the transportation is a transfer, collection, or delivery provided by a rail carrier, water carrier, or freight forwarder who are subject to jurisdiction under the Act, or the agents of such carrier or forwarder, and the transportation is incidental to the transportation or service provided by such carrier.[42]

XL argues that because the cargo was stolen while sitting at the "terminal" of Bullocks in Salt Lake City, the terminal exemption should apply. However, while the precise meaning of "terminal area" may not be clear, it is clear that it does not refer to the terminal area of carriers, instead, it refers to a commercial area around a city and is determined by the population of the city.

Furthermore, it appears that the main purpose of the exemption was to avoid ·submitting purely local operations to liability under the Carmack Amendment. Thus, the exemption would apply, for example, where a long-haul carrier contracted with a local pick-up and delivery service to deliver the goods within the commercial zone of a city. In this way the "exemption allows local cartage operators to contract with or act as agents for regulated line-haul carriers when performing such services within the carriers' terminal [or commercial] areas."[43] The exemption also

benefits freight forwarders, such as Skyway, by allowing "local cartage operators [to] act as agents for them in performing collection and delivery services."[44] Skyway, for example, could have contracted with a local cartage carrier to deliver the goods from Skyway's facility within Salt Lake City to Bullocks' Salt Lake facility without subjecting the local carrier to Carmack Amendment liability. It is this type of "transfer, collection, or delivery" that is purely local and "incidental" to the primary interstate transportation of the cargo that is exempted from the Carmack Amendment. The fact that the goods in this case were sitting at the terminal of Bullocks when stolen is irrelevant to Carmack Amendment liability.

## CONCLUSION

For the foregoing reasons, Bullocks Express motion for partial summary judgment is GRANTED (# 76–1). Bullocks' potential liability shall be limited to $5.00 per pound. The motion by XL specialty to strike the affidavit of Bruce Bullocks is denied (# 88–1). The motion by XL specialty to strike the affidavit of Donald Sands is denied (# 90–1). Inasmuch as Bullocks Objections are considered a motion to strike evidence they are denied (# 93–1). XL has also filed an *Ex Parte* Application for Leave to File Supplemental Memorandum and Supplemental Memorandum in Opposition to Bullocks' Motion for Partial Summary Judgment. The court GRANTS the application. However, the court has addressed the additional arguments presented and finds them unpersuasive.

The final pre-trial conference and the trial date are stricken. At oral arguments

41. 49 U.S.C. § 13503.

42. *Id.*

43. *Short Haul Survival Committee v. United States,* 572 F.2d 240, 243 (9th Cir.1978).

44. *Id.* at 248.

the court informed the parties of its intention to treat XL's Memorandum in Opposition as a Motion for Summary Judgment on Bullocks' liability under the Carmack Amendment. Bullocks shall have until and including September 9, 2004 to file an opposition memorandum. XL shall have until and including September 24 to file a reply to the opposition. XL shall be permitted to raise issues outside of the scope of the opposition memorandum if necessary. If XL does raise issues outside of the scope of the opposition memorandum in its reply, Bullocks shall have the opportunity to respond, but shall be limited in its response to those issues raised by XL which were outside of the scope of the opposition memorandum. Bullocks' reply to the reply shall be due no later than October 8, 2004. Unless the court determines that an additional hearing would be helpful, the court will rule on the pleadings.