NIPPON YUSEN KAISHA, Plaintiff,

v.

The BURLINGTON AND NORTHERN SANTA FE RAILWAY CO. et al., Defendants.

No. CV 03–6523GAFRZX.

United States District Court, C.D. California.

April 8, 2005.

---

Erich P. Wise, Nicholas S. Politis, Thomas C. Jorgensen, Flynn Delich & Wise, Long Beach, CA, for Plaintiff.

Leslie G. McMurray, Leslie G. McMurray Law Offices, Valley Village, CA, for Defendants.

## MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

FEESS, District Judge.

## I.

## INTRODUCTION

Plaintiff Nippon Yusen Kaisha ("NYK") is an ocean carrier that ships cargo on marine vessels all over the world. NYK was hired by Matsushita, the parent company of Panasonic, to move various electronics from Japan to Texas. NYK subcontracted with Defendant Burlington & Northern Santa Fe Railway Co. ("BNSF") for rail transportation for the California to Texas leg of the journey. The BNSF train crashed en route damaging the Matsushita cargo. In this suit, NYK seeks to recover from BNSF the approximately $387,000 it was forced to pay to Matsushita for the damaged cargo pursuant to the terms of the waybill. The question of whether BNSF is required to shoulder these costs is complicated by a series of federal statutes and regulations governing railroads.

Now before the Court is BNSF's motion for summary judgment. Plaintiff's complaint alleges six causes of action—five under common law and one under the federal Carmack Amendment. The Court finds that all five common law claims are preempted by the Carmack Amendment but that Plaintiff's cause of action under the Carmack Amendment survives. Accordingly, BNSF's motion for summary judgment is **GRANTED IN PART and DENIED IN PART**.

## II.

## STATEMENT OF FACTS

### A. THE NYK WAYBILLS ISSUED TO MATSUSHITA

In September 2002, Plaintiff NYK issued four waybills (bills of lading)[1] to shipper Matsushita Electric Industrial Company. (Hooker Decl., Exs. A–D). The waybills were for the shipment of five containers containing commercial microwave ovens, and Panasonic televisions and plasma screens. (*Id.*). The goods were to be picked up in Japan and delivered to Roanoke, Texas, to the offices of Matsushita's subsidiary, Panasonic. (*Id.*). The waybills specified that NYK was to transport the goods across the ocean via the "NYK Starlight," to discharge at the Port of Los Angeles, California, with continued inland shipment to Roanoke. (*Id.*). The waybills did not incorporate the liability limitations provided by the Carriage of Goods by Sea Act ("COGSA"), but instead the higher values provided by the Hague Visby Rules, for which Matsushita presumably paid a higher shipping rate. (*Id.* ¶ 6).

### B. THE NYK–BNSF CONTRACT

On June 1, 2001, NYK and BNSF entered into an agreement referred to by the parties as "MA 60," which apparently governs the repeat business conducted between the two carriers. (Statement of Genuine Issues "SGI" ¶ 3). At some point before October 2002, BNSF agreed to transport the five Matsushita containers from California to Texas under the terms of MA 60. (*Id.*). MA 60 provides that the terms and conditions of the contract are governed by the "BNSF Rules and Poli-

---

1. "A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of the carriage, and serves as evidence of the contract for carriage." *Norfolk Southern Railway Co. v. Kirby,* —— U.S. ——, ——, 125 S.Ct. 385, 390, 160 L.Ed.2d 283 (2004).

cies Guide," which BNSF updates periodically. (*Id.;* Johnson Decl. ¶ 3, Ex. B). When BNSF agreed to ship the Matsushita containers, the BNSF Intermodal Rules and Policies Guide ("the Guide") issued January 2002 was in effect. (SGI ¶ 3).

The Guide offers two forms of liability protection for shippers. First, BNSF offers full-value liability as provided under the Carmack Amendment, which is referred to in the Guide by its code section number and labeled "49 USC 11706 LIABILITY TERMS." (Johnson Decl., Ex. C at 36). In order to ship goods under the full liability coverage provided in this section, a shipper must comply with a series of five requirements, which includes paying a 200% increase in the limited liability shipping rate. (*Id.*). It is undisputed that NYK did not take steps necessary to ship under these liability terms.[2] (SGI ¶ 4).

The second form of liability protection is the default and provides that,

> BNSF SHALL NOT BE LIABLE FOR LOSS OR DAMAGE TO LADING UNLESS THERE IS PROOF OF BNSF NEGLIGENCE CAUSING THE LOSS OR DAMAGE.

In any event, BNSF has limited liability of $250,000 per shipment, except for tank container shipments that carry a limited liability of $100,000.

In addition, BNSF will not be liable for damages where BNSF's liability is determined to be $250 or less.

If the shipper wished to obtain a higher loss or damages limit, the shipper has the following two options:

- The shipper may obtain insurance; OR
- The shipper may obtain coverage under the terms of 49 USC 11706.

(Johnson Decl., Ex. C at 35–36). The terms of the contract are controlled by Texas state law. (McMurray Decl., Ex. I).

## C. THE CRASH AND NYK'S PAYMENT TO MATSUSHITA

On October 24, 2002, the BNSF train carrying the Matsushita containers derailed. (SGI ¶ 6). At the time of derailment, the BNSF train was operated by a BNSF engineer on tracks owned by Union Pacific Railroad ("UPRR"), pursuant to a contract between BNSF and Union Pacific. (SGI ¶¶ 6, 37, 39). NYK paid Matsushita $387,349.83 for damage to the goods resulting from the derailment. (BNSF's Response to SGI "RSGI" ¶ 26). This was allegedly the amount owing to Matsushita under the terms of waybills (the Hague Visby Rule amounts) provided by NYK. (*Id.*).

## D. THE FEDERAL SUIT

NYK brought the instant action against BNSF in California state court alleging breach of contract, negligence, breach of bailment duties, indemnity and contribution, and declaratory relief. (Compl. ¶¶ 10–31). Phrased as an "alternative" cause of

**2.** In its response to BNSF's statement of uncontroverted facts, NYK disputes "whether the terms offered by BNSF differ in their entirety from the Carmack Amendment," stating that the terms do not state that "BNSF is not liable for damage caused by another rail carrier," that "they do not include the option of strict liability and liability for loss or damage caused by Union Pacific as required by the Carmack Amendment," and that "they are ambiguous with respect to whether the Carmack burden of proof rules and liability for damage caused by BNSF apply." (SGI ¶ 4). NYK mentions this only in its statement of genuine issues, not in its brief to the Court, and cites no authority for its claims. Furthermore, these objections do not address whether NYK fulfilled the five requirements for shipment under the "49 USC 11706 LIABILITY TERMS," and thus that fact remains undisputed.

action, NYK also claimed that "if it is determined that the Carmack Amendment does apply," BNSF is liable for the full value of damaged goods. (*Id.* ¶¶ 23–25). BNSF timely removed the action to federal court. Now before the Court is BNSF's motion for summary judgment.

## III.

## ANALYSIS

### A. SUMMARY JUDGMENT STANDARD

On motion for summary judgment under Federal Rule of Civil Procedure 56(c), this Court must decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but "must set forth specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e). Moreover, the non-moving party who bears the burden of proving an element essential to its case must make a showing sufficient to establish a genuine issue of fact with respect to the existence of that element of the case or be subject to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

An issue is genuine if there is evidence produced that would allow a reasonable jury to reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The Court will assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). But where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631–32 (9th Cir.1987). In that regard, "[a] mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather the nonmoving party must introduce some significant probative evidence tending to support the claim.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir.1997) (quoting *Anderson*, 477 U.S. at 252, 249, 106 S.Ct. 2505); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288 (9th Cir.1987) (summary judgment may be granted if "the evidence is merely colorable ... or is not significantly probative"). Thus, if a defendant moves for summary judgment and establishes that the undisputed facts prove that the plaintiff's case lacks one of its essential elements, the motion must be granted.

### B. NYK'S COMMON LAW CLAIMS ARE PREEMPTED BY THE CARMACK AMENDMENT

BNSF's arguments for summary judgment of NYK's common law claims can be summarized in three parts: 1) the Carmack Amendment provides the exclusive avenue for recovery in any suit brought against an interstate carrier for loss or damage to transported goods; 2) 49 U.S.C. § 10502(e) allows rail carriers to offer terms less than the full value recovery provided by the Carmack Amendment; and 3) even when suing under such alternative terms, the only proper cause of action is under the Carmack Amendment and all other claims are preempted. The Court agrees.

#### 1. Background on the Carmack Amendment

The Carmack Amendment, now at 49 U.S.C. § 11706, was enacted in 1906 as part of the former Interstate Commerce Act. *NYK Line v. BNSF Ry. Co.*, 222

F.Supp.2d 1176, 1179 (C.D.Cal.2002). "The purpose of the Carmack Amendment was to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *Reider v. Thompson,* 339 U.S. 113, 119, 70 S.Ct. 499, 94 L.Ed. 698 (1950). The amendment provides a statutory right of recovery and subjects a rail "carrier transporting cargo in interstate commerce to absolute liability for actual loss or injury to property." *Hughes Aircraft Co. v. North Am. Van Lines, Inc.,* 970 F.2d 609, 611 (9th Cir.1992). It states in relevant part that

> (a) A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall issue a receipt or bill of lading for property it receives for transportation under this part. That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Board under this part are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this subsection is for the actual loss or injury to the property caused by—
> (1) the receiving rail carrier;
> (2) the delivering rail carrier; or
> (3) another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.

49 U.S.C. § 11706(a).

 "By 1976 railroads were unable to effectively compete with other modes of transportation because of regulation." *M.R. Swanson, Inc. v. The Burlington N. and Santa Fe Ry. Co.,* 2001 WL 201378,

*3, 2001 U.S. Dist. LEXIS 25463, *7 (E.D.Cal. Febr. 21, 2001). In response, Congress enacted the Railroad Revitalization and Regulatory Reform Act, Pub.L. No. 94–210, which allowed the Interstate Commerce Commission, now known as the Surface Transportation Board ("STB"),[3] "to exempt certain rail services from other regulations." *Id.* Congress continued on its path of deregulation in 1980 with passage of the Staggers Rail Act, Pub.L. No. 96–448. *Id.* One section of this act addresses the Carmack Amendment stating that "nothing in . . . section 11706 of the title shall prevent rail carriers from offering alternative terms." 49 U.S.C. § 10502(e). "Courts have interpreted this provision to mean that . . . . carriers can contract for limited liability terms at reduced rates if the carrier also offers Carmack Amendment liability at regular rates." *M.R. Swanson,* 2001 WL 201378 at *4, 2001 U.S. Dist. LEXIS 25463 at *10 (collecting cases).

## 2. The Carmack Amendment Preempts All Other Liability Claims

Shortly after the Carmack Amendment was passed, the Supreme Court found that Congress had "intended to take possession of the subject, and supercede all state regulation with reference to it." *Adams Express Co. v. Croninger,* 226 U.S. 491, 505–06, 33 S.Ct. 148, 57 L.Ed. 314 (1913), and that the amendment became the exclusive remedy in a suit against a rail carrier to recover losses for damage to transported goods. *Missouri Pacific R.R. Co. v. Elmore & Stahl,* 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964) ("[T]he liability of a carrier for damage to an interstate shipment is a matter of federal

---

**3.** Congress replaced the ICC with the STB in the Interstate Commerce Commission Termi-

nation Act of 1995, 49 U.S.C. § 702.

law controlled by federal statutes and decisions").

Post deregulation, "even when the shipper and carrier have contracted for specific rates and conditions, ... the Carmack Amendment still preempts all state and common law claims for breach of contract and negligence for goods damaged by carriers." *M.R. Swanson,* 2001 WL 201378 at *2, 2001 U.S. Dist. LEXIS 25463 at *10; *see also NYK Line (North America), Inc. v. Burlington N. and Santa Fe Ry. Co.,* 222 F.Supp.2d 1176, 1179 (C.D.Cal.2002) ("The Carmack Amendment preempts all state common law claims and constitutes the exclusive avenue for recovery in any suit brought against an interstate carrier for loss or damages to the transported goods"); *Intercargo Ins. Co. v. Burlington N. Santa Fe R.R.,* 185 F.Supp.2d 1103, 1112 (C.D.Cal.2001) (finding that even under alternative Carmack terms, due to "the preemptive scope of the Carmack Amendment, the only claim plaintiff may assert against BNSF is a claim for damages under the Carmack Amendment"); *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 379 (5th Cir.1998) ("We hold that federal common law remedies are preempted by the Carmack Amendment"); *Pietro Culotta Grapes Ltd. v. S. Pacific Transp. Co.,* 917 F.Supp. 713, 716 (E.D.Cal.1996) ("because the availability of plaintiffs' state common law causes of action would be inconsistent with the uniformity goal of the Carmack Amendment .... [p]laintiffs' [state law] claims are preempted"); *Hughes Aircraft*

*Co. v. N. Am. Van Lines, Inc.,* 970 F.2d 609, 613 (9th Cir.1992) ("[Plaintiff] argues, however, that the Carmack Amendment does not preempt a state law negligence cause of action where the common carrier is operating on a *contract* basis. [This] argument is completely meritless."). Accordingly, the Court GRANTS BNSF's motion for summary judgment on NYK's common law claims.[4]

## C. NYK'S CAUSE OF ACTION UNDER THE CARMACK AMENDMENT

### 1. The Legal Standard

In order to make out a prima facie case of liability under the Carmack Amendment, NYK must show "that goods, which were dropped off in good condition, arrived in damaged condition (or not at all), and the amount of damages." *Intercargo Ins. Co. v. Burlington N. Santa Fe R.R.,* 185 F.Supp.2d 1103, 1111 (C.D.Cal. 2001) (citing to *Missouri Pac. R.R. Co. v. Elmore and Stahl,* 377 U.S. 134, 138, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964)). BNSF concedes that these elements have been met.

After the prima facie case has been met, the rail carrier may assert an affirmative defense in the form of the alternative liability scheme allowed under 49 U.S.C. § 10502(e). In *Intercargo,* 185 F.Supp.2d at 1111, the Court observed that "[t]he use of alternative terms does not negate the application of the Carmack Amendment; rather, the use of alternative terms is seen as a type of affirmative defense that a rail

---

4. Although generally conceding Carmack applicability, NYK questions it in a footnote due to the fact that the shipment originated in Japan under a through bill of lading. (Opp. at 8 n. 1). However, in *Neptune Orient Lines, Ltd. v. BNSF,* the Ninth Circuit found that the Carmack Amendment applies to "the inland leg of an overseas shipment conducted under a single 'through' bill of lading" as well as "separate inland bills of lading for shipments

to or from overseas ports." 213 F.3d 1118, 1119 (9th Cir.2000); *see also Swift Textiles, Inc. v. Watkins Motor Lines, Inc.,* 799 F.2d 697, 701 (11th Cir.1986) (finding that former version of 49 U.S.C. § 10501(a)(2)(F), § 10521(a)(1)(E), subjected domestic leg of shipment of foreign goods to Carmack "as long as the domestic leg is covered by separate bill or bills of lading").

carrier may assert against a claim for damages under the Carmack Amendment." See also *M.R. Swanson*, 2001 WL 201378 at *2, 2001 U.S. Dist. LEXIS 25463 at *10.[5]

#### 2. Analysis

BNSF's alternative liability scheme holds BNSF liable for damage to cargo only where there is proof of BNSF negligence and limits that liability to $100,000 for tank car shipments and $250,000 for all other shipments. (Johnson Decl., Ex. C at 35–36). The parties, however, dispute both the scope of the liability and the standard of negligence to be applied.

#### a. BNSF's Liability for the Negligence of UPRR

■ NYK claims that BNSF is liable for the negligence of UPRR, and therefore its Carmack cause of action encompasses any UPRR negligence. Plaintiff offers two arguments in support of its position, neither of which is convincing. First, NYK contends that under the liability terms provided by the Carmack Amendment, BNSF would be absolutely liable for any property loss caused by "another rail carrier over whose line or route the property is transported." 49 U.S.C. § 11706(a). This is indeed true and would control except for the fact that BNSF

offered alternative terms in accordance with 49 U.S.C. § 10502(e). Those terms, which were accepted by NYK, unequivocally, in all capital letters, state that BNSF is liable only for damage where "THERE IS PROOF OF BNSF NEGLIGENCE." (Johnson Decl., Ex. C at 35–36). Therefore, by its plain terms, this agreement does not include liability for the negligence of others.

NYK also argues, that "a rail carrier can not contract out of its liability for cargo losses caused by other participating carriers." (Opp. at 12). As support, NYK first cites a Supreme Court case from 1911, *Atlantic Coast Line R. Co. v. Riverside Mills*, which does a very good job of explaining the policy reasons behind Congress' choice to make the receiving or initial carrier responsible for the negligence of all subsequent subcontracted carriers or track owners through the Carmack Amendment. 219 U.S. 186, 204–205, 31 S.Ct. 164, 55 L.Ed. 167 (1911). Predictably, it does nothing to explain the application or scope of the liability exemptions passed more than 50 years later, including § 10502(e).

Second, NYK claims that the regulation providing the ability to exempt the shipment under 49 U.S.C. § 10502(e) does not allow rail carriers to exempt themselves

---

**5.** Additionally, in the Ninth Circuit, there exists a threshold requirement to assertion of an alternative liability defense. In *Hughes Aircraft v. North Am. Van Lines*, the Ninth Circuit held

> [b]efore a carrier's attempt to limit its liability will be effective, the carrier must (1) maintain a tariff in compliance with the requirements of the Interstate Commerce Commission; (2) give the shipper a reasonable opportunity to choose between two or more levels of liability; (3) obtain the shipper's agreement as to his choice of carrier liability limit; and (4) issue a bill of lading prior to moving the shipment that reflects any such agreement.

970 F.2d 609, 611–12 (9th Cir.1992). There is no dispute that BNSF has met the last three requirements. (SGI ¶¶ 1–4). While BNSF presents no evidence of having filed a tariff, the ICC no longer exists and at least one district court has found that "a rail carrier is not required to file its tariff rate with the [STB]." *Consolidated Rail Corp. v. Canada Malting Co., Ltd.*, 2000 WL 151160 *7 (E.D.Pa.2000). In so finding, the court relied on the language of 49 U.S.C. § 11101(b) which requires only that rates be given to individuals stating that "[a] rail carrier shall also provide to any person, on request, the carrier's rates and other service terms." Thus, BNSF has fulfilled the *Hughes* requirements.

from losses caused by subcontractors. A look at the wording of both the statute and the supporting regulation, however, show otherwise. 49 C.F.R. § 1090.2 provides exemption for rail carriers involved in the intermodal movement of containerized freight. It provides in pertinent part that

> Except as provided in 49 U.S.C. 10505(e) and (g), 109229(1), and 10530, rail TOFC/COFC service and highway TOFC/COFC service provided by a rail carrier either itself or jointly with a motor carrier as part of a continuous intermodal freight movement is exempt from the requirements of 49 U.S.C. subtitle IV .... **The exemption does not ... operate to relieve any carrier of any obligation it would otherwise have, absent the exemption, with respect to providing contractual terms for liability and claims.**

49 C.F.R. § 1090.2 (emphasis added).[6]

Plaintiff argues that this language "reiterates § 10502(e)'s application of Carmack [liability terms] to COFC exempt contracts." (Opp. at 12). However, a look at the language of § 10502(e) clearly shows that this is not the case. The statute provides,

> (e) No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11706 of this title. Nothing in this subsection or section 11706 of this title shall prevent rail carriers from offering *alternative terms* nor give the Board the authority to require any specific level of rates or services based upon the provisions of section 11706 of this title.

49 U.S.C. § 10502(e) (emphasis added).

The first part of this section simply means that the STB does not have authori-

ty to remove Carmack liability entirely. Rail carriers must provide shippers *the option* of using Carmack terms. However, the section goes on to explain that rail carriers may also offer alternative terms. *M.R. Swanson,* 2001 WL 201378 at *2, 2001 U.S. Dist. LEXIS 25463 at *10 ("Courts have interpreted this provision to mean that .... carriers can contract for limited liability terms at reduced rates if the carrier also offers Carmack Amendment liability at regular rates."); *Co–Operative Shippers, Inc. v. Atchison, Topeka, and Santa Fe R.R. Co.,* 840 F.2d 447, 449 (7th Cir.1988).

By the plain words of the regulation, 49 C.F.R. § 1090.2 stands for the same proposition. It first exempts rail carriers shipping COFC cargo from Carmack terms and then states that such terms must still be *offered* to shippers, an offer that NYK in this case expressly declined. Thus, the regulation "reiterate[s] § 10502(e)'s application of Carmack to COFC exempt contracts," but does not force all contracts made pursuant to the exemption to incorporate Carmack terms. Accordingly, BNSF is liable only for damage caused by its own negligence and not for that of UPRR.

### b. The Applicable Negligence Standard

Because the only viable cause of action is NYK's statutory Carmack Amendment claim, and that by the alternative terms provided in the contract BNSF is liable only for its own negligence, the next stage in the inquiry, and the heart of the motion, is what standards apply in determining BNSF's negligence.

### i) FRSA Does Not Entirely Preempt a Carmack Amendment Claim

■ BNSF claims that the Federal Railroad Safety Act ("FRSA") preempts

**6.** COFC stands for "container on flat car transport." (Reply at 7 n. 17).

any assertion that it was negligent, preventing NYK from even bringing suit claiming negligence with regard to railroad safety. NYK counters that FRSA does not preempt its cause of action because it is brought under the federal Carmack Amendment, not state law. The Court finds that FRSA's uniformity goals are met by simply allowing the federal regulations, where available, to serve as the standards of care for Plaintiff's Carmack claim. Areas not covered by federal regulations are determined by Texas negligence law as provided by the contract.

FRSA, now at 49 U.S.C. §§ 20101 *et seq.*, was passed by Congress in 1970. Its purpose is "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries . . . ." 49 U.S.C. § 20101. To that end, FRSA gives the Secretary of Transportation broad powers to issue regulations. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 662, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993); 49 U.S.C. § 20103.

Section 20106 describes the preemptive effect of such regulations stating that

> Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with

respect to railroad safety matters) . . . prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106 (emphasis added).[7] The Supreme Court has found that "[l]egal duties imposed on railroads by the common law fall within the scope of these broad phrases." *Easterwood*, 507 U.S. at 664, 113 S.Ct. 1732.

However, the Carmack Amendment is not a common law claim but a federal statutory cause of action, albeit one where liability is based on negligence. In *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 662, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), the Supreme Court discussed the scope of FRSA's preemptive powers. The Court stated that

> pre-emption will not lie unless it is the clear and manifest purpose of Congress. Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue. If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.

*Easterwood*, 507 U.S. at 664, 113 S.Ct. 1732 (internal citations and quotations omitted). The plain wording of § 20106 says nothing about preempting federal statutory causes of action, such as the Carmack Amendment. BNSF cites no authority finding that FRSA preempts Carmack suits[8] and the Court finds such

---

7. The section also provides that "[a] State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order-(1) is necessary to eliminate or reduce an essentially local safety or security hazard; (2) is not incompatible with a law, regulation, or order of the United States Government; and (3) does not unreasonably burden interstate commerce." 49 U.S.C. § 20106. None of these exceptions are relevant in the Instant case.

8. BNSF cites to *Federal Ins. Co. v. The Burlington Northern and Santa Fe Railway Co.*, 270 F.Supp.2d 1183 (C.D.Cal.2003) (hereinafter *"FIC"*), for its proposition that NYK's Carmack claim is preempted by FRSA. However, the court in *FIC* did not find with regard to a Carmack claim, but a common law cause of action. *Id.* at 1184–85. Furthermore, even when arguing alternatively that preemption did not apply, the court still used FRSA regulations as the standard of care to determine liability. *Id.* at 1188.

a proposition inconsistent with Congress' goal of Carmack liability. Under BNSF's theory, BNSF is allowed to contract around absolute liability by providing alternate terms, which are then unenforceable due to FRSA preemption, leaving shippers without a remedy under a circumstance where Congress originally imposed absolute liability.[9] "[A]ny understanding of a pre-emption statute's scope rests primarily on a fair understanding of *congressional purpose*," and "[i]t is, to say the least, difficult to believe that Congress would, without comment, remove all means of judicial recourse for those in-

jured by illegal conduct." *Medtronic Inc. v. Lohr*, 518 U.S. 470, 471, 487, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (internal quotations omitted).[10]

Nevertheless, it is clear that in passing FRSA, Congress intended that laws governing railroad safety "be nationally uniform to the extent practicable." 49 U.S.C. § 20106. Therefore, federal railroad safety regulations provide the best standard for federal uniformity, to the extent that such regulations "subsume the subject matter." *Easterwood*, 507 U.S. at 664, 113 S.Ct. 1732.

9. At least one court has found this right without a remedy scenario perfectly acceptable in the FRSA context. In *Ouellette v. Union Tank Co.*, a passenger brought a products liability action against a railroad car manufacturer alleging that her fall from the car was the result of a misplaced handhold. 902 F.Supp. 5, 7 (D.Mass.1995). The court found that FRSA entirely preempted the field, as federal regulations specified the type and placement of handrails to be used on railroad cars. *Id.* at 10. It further found that the plaintiff was not allowed to sue to enforce compliance with the regulations, stating that "while federal preemption often means that there is no remedy available to a claimant, in many instances unfortunately this result is necessary to vindicate the intent of Congress." *Id.* Although the court cited no direct authority for its holding, it did analogize its holding to a First Circuit decision regarding the *Medical Devices Act* ("MDA"). *Id.* The Court notes that since *Ouellette* was decided, the Supreme Court has severely limited the preemptive scope of the MDA. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (explicitly rejecting the argument that the MDA entirely preempted all suits because "it would create the perverse effect of granting complete immunity from ... liability to an entire industry that, in the judgment of Congress, needed more stringent regulation").

The "perverse effect" referred to by the *Medtronic* Court would hold true for Carmack claims as well for the reasons already stated in the text accompanying this footnote. Further, at least three other courts have found

that FRSA preemption only applies where the carrier has complied with federal regulations. *See Michael v. Norfolk S. Ry. Co.*, 74 F.3d 271, 273 (11th Cir.1996) ("[T]he state tort claim for defective design is preempted, so long as the railroad complied with the federal regulations"); *Stone v. CSX Transp., Inc.*, 37 F.Supp.2d 789, 794–95 (S.D.W.Va.1999) (finding that the comprehensive "federal regulations set the preemptive duty with which the railroad must comply"); *S. Pacific Transp. Co. v. Builders Transp., Inc.*, 1993 WL 185620 *2, 1993 U.S. Dist. LEXIS 7380 *7 (E.D.La. May 25, 1993) ("Of course, if the train was traveling in excess of the federal speed limit, [the plaintiff's] claim will not be preempted").

10. BNSF also claims preemption under the Interstate Commerce Commission Termination Act ("ICCTA") and the commerce clause. The Carmack Amendment's federal nature would also argue against preemption of these as well. Further, both the Sixth and Eighth Circuits have found that "ICCTA and the FRSA must be construed *in pari materia;* that the Federal Railroad Administration under the FRSA exercises primary authority over rail safety; and therefore that the FRSA, not ICCTA, determines whether a state law relating to rail safety is preempted." *Iowa, Chicago & E. R.R. Corp. v. Washington County, Iowa*, 384 F.3d 557, 560 (8th Cir.2004); *Tyrrell v. Norfolk S. Ry.*, 248 F.3d 517, 522 (6th Cir.2001). Thus, the Court will examine only FRSA preemption.

### ii) BNSF's Negligence Under FRSA Regulations

NYK has two main bases for arguing that BNSF was negligent. First, NYK asserts that UPRR negligently maintained the track and that BNSF is liable for this negligence. (Opp. at 18). The Court has already addressed this argument above, finding that by the plain terms of contract, BNSF was liable only for its own negligent acts. Second, NYK argues that the BNSF engineer operating the train at the time of derailment committed three negligent acts: one, he was going too fast for the conditions; two, he failed to use dynamic braking; and, three, he negligently changed throttle positions before derailment. (Opp. at 18).

### A. Speed

The standard of care for rail speed is subsumed by federal regulations. As the Supreme Court recognized in *CSX Transp., Inc. v. Easterwood*, "the Secretary, acting through the Federal Railroad Administration (FRA), promulgated regulations under FRSA setting maximum train speeds for different classes of track." 507 U.S. 658, 662, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (referring to 49 C.F.R. § 213.9). These regulations "set maximum allowable operating speeds for all freight and passenger trains for each class of track on which they travel." *Id.* at 673, 113 S.Ct. 1732. In finding that these speed regulations preempted a state negligence claim alleging that a crashed train was traveling too fast for the conditions, the Supreme Court stated,

> On their face, the provisions of § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into ac-

count. Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner...

*Id.* at 674, 113 S.Ct. 1732; *see also Hesling v. CSX Transp., Inc.*, 396 F.3d 632 (5th Cir.2005) (finding that even internal rules of a railroad carrier capping the speed of a train operating on its track are preempted by FRSA); *Michael v. Norfolk S. Ry. Co.*, 74 F.3d 271, 273 (11th Cir.1996) (same).

Thus, federal regulations provide the duty of care in this area and BNSF is only negligent if it violated them. It is undisputed that the track upon which the BNSF train was traveling was designated as a class 4 track. (SGI ¶ 8). 49 C.F.R. § 213.9(a) provides that the maximum allowable speed for a freight train on class four tracks is 60 m.p.h. It is undisputed that the train was traveling under 60 m.p.h. during the period leading up to the point of derailment and at the point of derailment. (SGI ¶ 9). As BNSF was operating within the speed designated by the regulations, there is no disputed issue of fact as to BNSF's negligence on this issue and thus summary judgment on the Carmack claim with regard to this issue is **GRANTED**.

### B. Dynamic Braking

BNSF also argues that both the "'breaking [sic] theory' and 'throttle use' theory are substantially subsumed within the federal restrictions on train speed," and thus the standard of care is provided under the speed regulation discussed above. (Mot. at 17). While it is true that acceleration and deceleration as provided by the throttle and brake, can effect train speed, this argument seems overly simplistic. For example, an engineer driving a

train under the prescribed speed conditions might still be found negligent where he failed entirely to apply brakes to avoid a known hazard. Thus, the speed regulations do not subsume this area.

The outstanding question is thus whether any specific regulations provide a substituted standard of care with regard to the use of dynamic braking. BNSF argues that "[b]reaking [sic] is clearly subsumed by the federal regulations," citing several regulations setting out requirements for braking/dynamic braking including, 49 C.F.R. §§ 229.13, 213.57, 222.109, 232.5 and 232.109. (Mot. at 17–18). However, the only section BNSF cites regarding the actual use of dynamic braking, is Appendix E to 49 C.F.R. § 240. This section states in pertinent part that

> the use of dynamic braking versus air brakes at a particular location may be a question of judgment unless the carrier has previously specified the use of a preferred braking method. In any case the engineer's judgment, to apply or not to apply a braking system at a given location, is subject to the opinion of the designated supervisor of locomotive engineers.

From this, BNSF argues that federal law mandates that use of dynamic braking is a judgment call on the part of the engineer and the supervisor. (Reply at 15). However, the cited section comes not from a regulation itself, but from an appendix of merely "recommended procedures" to aid railroads in devising operation plans, and therefore is not binding.

 NYK asserts a standard of care from another regulation mentioning the use of dynamic braking. Specifically, Plaintiff asserts that 49 C.F.R. § 232.109(j), requiring railroads to "adopt and comply with written operating rules governing safe train handling procedures using these dynamic brakes," provides the applicable standard of care. (Opp. at 18).

Under this theory, BNSF's own guidelines would provide the federally required duty of care. Regardless of whether this section really does provide a substituted standard of care, material questions of fact remain as to compliance with BNSF's braking procedures, with BNSF admitting noncompliance with at least three of the internal rules. (RSGI ¶¶ 45, 48). Further, if it does not provide the duty of care standard, then the reasonableness of the engineer's actions under Texas negligence law is surely a question for the jury. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990) (stating Texas negligence cause of action consists of duty, breach, causation and damages); *Scroggs v. Amer. Airlines, Inc.*, 150 S.W.3d 256, 261–62 (Tex.App.2004) (denying summary judgment on a negligence claim where the plaintiff presented "more than a scintilla of evidence" that the defendant's conduct was unreasonable). Either way, summary judgment on the Carmack claim with regard to the use of dynamic braking is DENIED.

### C. Throttle Control

NYK also argues that the BNSF engineer negligently changed throttle positions causing the derailment. (Opp. at 18). There does not appear to be any federal regulation specifying proper throttle use. BNSF points to four regulations, but none provide a standard of care, 49 C.F.R. § 210.27 (requiring new locomotives to print information of sound decibels at various throttle settings), 49 C.F.R. § 210.31 (also addressing allowable throttle noise emissions), 49 C.F.R. § 210 Appendix A (same), and 49 C.F.R. § 232.103 (requiring railroads to adopt standards for throttle positions of idle unattended trains). In order for federal regulations to have preemptive effect, they must do more than merely "touch upon or relate to that sub-

ject matter." *Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732 (quotations omitted).

Thus, federal regulations do not direct proper throttle settings or use for moving trains. Accordingly, throttle use is left to the jury to be decided under Texas negligence law and summary judgment is **DENIED** on this issue.

## IV.

## CONCLUSION

For the reasons stated above, BNSF's motion for summary judgment is **GRANTED IN PART** with respect to NYK's common law claims, but **DENIED IN PART** with respect to the Carmack Amendment claim.

IT IS SO ORDERED.